# EXHIBIT A



**U.S. Department of Justice**

Civil Rights Division

---

*Assistant Attorney General*
*950 Pennsylvania Avenue, NW - RFK*
*Washington, DC 20530*

July 11, 2008

Todd H. Stroger
Cook County Board President
118 N. Clark Street
Room 537
Chicago, IL  60602

Thomas Dart
Cook County Sheriff
Richard J. Daley Center
50 W. Washington Street
Room 704
Chicago, IL  60602

        Re:  Cook County Jail
             Chicago, Illinois

Dear President Stroger and Sheriff Dart:

     We write to report the findings of the investigation of the Civil Rights Division and the United States Attorney's Office into conditions at the Cook County Jail ("CCJ").  On February 16, 2007, we notified the Cook County Board of Commissioners ("County") of our intent to conduct an investigation of CCJ pursuant to the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. § 1997.  As we noted, CRIPA gives the Department of Justice authority to seek a remedy for a pattern or practice of conduct that violates the constitutional rights of inmates in adult detention and correctional facilities.

     On June 18-22, 2007, and July 23-27, 2007, we conducted on-site inspections at CCJ with expert consultants in corrections, use of force, custodial medical and mental health care, fire safety, and sanitation.[1]  We interviewed administrative staff, security staff, medical and mental health

---

     [1]    Our fire safety and sanitation experts accompanied us only on the July on-site visit.

- 2 -

staff, facilities management staff, training staff, and inmates.
Before, during, and after our visits, we reviewed an extensive
number of documents, including policies and procedures, incident
reports, use of force reports, investigative reports, inmate
grievances, disciplinary reports, unit logs, orientation
materials, medical records, and staff training materials.  In
keeping with our pledge of transparency and to provide technical
assistance where appropriate, we conveyed our preliminary
findings to CCJ officials and legal counsel for the County and
Sheriff's Office at the close of our July 2007 site visit.

During our July 27, 2007 exit meeting, and by letter dated
August 3, 2007, we notified CCJ officials of life-threatening
deficiencies in sanitation and safety measures at CCJ.  In
particular, we indicated that inadequate emergency key
precautions and grossly unsanitary conditions in certain tiers
resulted in a serious and immediate risk of harm to inmates.  On
August 6, 2007, counsel for the Sheriff's Office promptly
responded by indicating that a number of corrective measures were
being implemented to address our concerns.[2]

We commend the staff at CCJ for their helpful and
professional conduct throughout the course of the investigation.
We received complete cooperation with our investigation, which is
particularly appreciated given that CCJ is the country's largest
single-site jail.  CCJ provided us with unfettered access to
records and personnel, and responded to our requests, both before
and during our on-site visits, in a transparent and forthcoming
manner.  We also appreciate the County's and the Sheriff's
Office's receptiveness to our consultants' on-site
recommendations.  Accordingly, we have every reason to believe
that the County and the Sheriff's Office are committed to
remedying all known deficiencies at CCJ.

Consistent with the statutory requirements of CRIPA, we now
write to advise you of the findings of our investigation, the
facts supporting them, and the minimum remedial steps that are
necessary to address the deficiencies we have identified.
42 § U.S.C. 1997b.  As described more fully below, we conclude
that certain conditions at CCJ violate the constitutional rights

---

[2]     Counsel for the Sheriff's Office provided additional
information regarding corrective measures in a letter and
attachments on October 5, 2007.  We commend the Sheriff's Office
on these reported advances and view them as progress toward
improved conditions at CCJ.  We look forward to the opportunity
to verify the improvements.

- 3 -

of inmates.  In particular, we find that inmates confined at CCJ
are not adequately protected from harm, including physical harm
from excessive use of force by staff and inmate-on-inmate
violence due to inadequate supervision.  In addition, we find
that inmates do not receive adequate medical and mental health
care, including proper suicide prevention.  CCJ inmates also face
serious risks posed by inadequate fire safety precautions.
Finally, we find that environmental and sanitation deficiencies
at CCJ result in unconstitutional living conditions for inmates.

As discussed in this letter, these conditions have resulted
in serious harm to CCJ inmates.  Three inmates committed suicide
at CCJ in the first four months of 2008.  During our
investigation, we identified multiple preventable inmate deaths
and a preventable amputation, due to inadequate medical care.  In
2006, separate incidents of unchecked inmate violence resulted in
two inmate deaths.  In a one-week period during March 2007, CCJ
documented 35 inmate fights, required 27 uses of force, and found
46 weapons within the facility.  The myriad of serious incidents
summarized here, and others discussed herein, indicates that CCJ
is not adequately providing for the safety and well-being of the
inmates.

## I.  BACKGROUND

Located on approximately 96 acres in Chicago, Illinois, CCJ
is the largest single-site county jail in the United States.[3]
CCJ has a daily population of approximately 9,800 adult male and
female inmates, most of whom are awaiting trial in the criminal
court system.  In 2006, CCJ admitted 99,663 inmates.  CCJ is
staffed by approximately 3,800 sworn law enforcement officers and
civilian employees.

CCJ is separated into 11 semi-autonomous divisions,[4] each
with its own superintendent and standard operating procedures.
The majority of the male inmates are housed in three
maximum-security divisions (Divisions I, IX, and X), three
medium-security male divisions (Divisions V, VI, and XI), and one
medium and minimum-security dormitory division (Division II).
Female inmates of mixed security classifications are housed on

---

[3]      http://www.cookcountysheriff.org/doc/html/facility.html

[4]      The divisions are designated by number, one through
eleven.  There is no Division VII.  The Receiving Classification
Diagnostic Center essentially functions as a separate division,
with its own superintendent.

- 4 -

Division III, which also contains male and female medical and
mental health tiers, and Division IV.  Division VIII contains
Cermak Health Services and the Residential Treatment Unit.  The
Receiving, Classification, and Diagnostics Center ("RCDC") is
located in the lower level of Division V and handles reception,
classification, and discharge for all CCJ inmates.  Division I is
the oldest building, dating from 1929, and Division XI is the
newest, opened in 1995.  The divisions range in rated capacity[5]
from 353 inmates in Division III to 1,536 in Division XI.

All corrections and security functions at CCJ are
administered by the Cook County Department of Corrections
("CCDOC") under the Cook County Sheriff.  Health care services at
CCJ are provided by Cermak Health Services of Cook County
("Cermak"), which is part of the Cook County Bureau of Health.
While the health services staff are County employees who are
responsible for the health care of all CCJ inmates, they are not
employed by, or responsible to, the Cook County Sheriff or CCDOC.
Although health care and security issues require a degree of
separation in all correctional facilities, as discussed in more
detail below, the complete division between corrections and
health care operations at CCJ results in serious administrative
problems, including increased frustration, communication
breakdowns, and finger-pointing.  Regardless of the
administrative division, Cook County and the Cook County
Sheriff's Office are responsible for the well-being of CCJ
inmates, including providing adequate care for inmates' serious
medical and mental health care needs.

In 1982, the County entered into a consent decree in Duran
v. Dart, No. 74-C-2949 (N.D. Ill. Apr. 9, 1982) ("Duran Consent
Decree") to resolve a class action lawsuit filed by pre-trial
detainees, pursuant to 42 U.S.C. § 1983, regarding overcrowding
of CCJ.  The Duran Consent Decree, as amended, is still under the
jurisdiction of the United States District Court for the Northern
District of Illinois.  The decree focuses on overcrowding, but
does contain some provisions governing staffing, food service,
personal hygiene, the law library, visitation, physical exercise,
classification, environmental health, and emergencies.  CCJ's
compliance with the Duran Consent Decree is monitored by the John
Howard Association.  CCJ is also governed by multiple other
agreements and orders, such as Harrington v. DeVito, No. 74-C-
3290 (N.D. Ill. Oct. 19, 1978) (mental health care) and Jackson

_____

[5]     Actual capacity is often much lower than the rated
capacity due to cells that are inoperable as a result of
maintenance problems.

- 5 -

v. Sheriff of Cook County, No. 06-CV-493 (N.D. Ill. July 16,
2007) (STD testing).  Despite the existence of these court
orders, a myriad of unconstitutional practices remain at CCJ.
The current court orders applicable to CCJ either do not include
specific provisions governing the constitutional concerns raised
below regarding protection from harm, inadequate medical and
mental health care, fire safety, and sanitation, or have not
resulted in lasting or effective corrective measures.

## II.  LEGAL STANDARDS

CRIPA authorizes the Attorney General to seek injunctive
relief to enforce the constitutional rights of inmates subject
to a pattern or practice of unconstitutional conditions in jails and
prisons.  42 U.S.C. § 1997.  In defining the scope of jail
inmates' Eighth and Fourteenth Amendment rights, the Supreme
Court has held that corrections officials must take reasonable
steps to guarantee inmates' safety and provide "humane
conditions" of confinement.  Farmer v. Brennan, 511 U.S. 825, 832
(1994); Bell v. Wolfish, 441 U.S. 520 (1979) (holding pre-trial
detainees protected by Fourteenth Amendment); Cavalieri v.
Shepard, 321 F.3d 616, 620 (7th Cir. 2003).  Providing "humane
conditions" requires that a corrections system must "take
reasonable measures to guarantee the safety of the inmates" and
satisfy inmates' basic needs, such as their need for medical
care, food, clothing, and shelter.  Farmer at 832.  The
protection of pre-trial detainees' rights under the due process
clause of the Fourteenth Amendment is "at least as great as the
Eighth Amendment protections available to a convicted prisoner."
City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244 (1983).

When a jurisdiction takes a person into custody and holds
him there against his will, the Constitution imposes upon it a
corresponding duty to assume some responsibility for his safety
and general well-being.  County of Sacramento v. Lewis, 523 U.S.
833, 851 (1998) (citing DeShaney v. Winnebago County Dept. of
Social Servs., 489 U.S. 189, 199-200 (1989)).

The duties imposed and rights conferred by the Eighth
Amendment apply to the unreasonable risk of serious harm, even if
such harm has not yet occurred:

> We have great difficulty agreeing that prison
> authorities may not be deliberately indifferent to an
> inmate's current health problems but may ignore a
> condition of confinement that is sure or very likely to
> cause serious illness and needless suffering the next
> week or month or year . . . .  That the Eighth Amendment

- 6 -

protects against future harm to inmates is not a novel
proposition.  The Amendment, as we have said, requires
that inmates be furnished with the basic human needs,
one of which is reasonable safety.

Helling v. McKinney, 509 U.S. 25, 33 (1993) (internal citations
and quotations omitted); Woodward v. Correctional Medical
Services of Illinois, Inc., 368 F.3d 917, 927 (7th Cir. 2004)
(citing Farmer, 511 U.S. at 842).

The "Eighth Amendment prohibition against cruel and unusual
punishment has been expanded under the Due Process Clause of the
Fourteenth Amendment to impose upon both federal and state
correctional officers and officials the obligation to take
reasonable steps to protect inmates from violence at the hands of
other inmates."  Goka v. Bobbitt, 862 F.2d 646, 649-50 (7th Cir.
1988); see also Hudson v. Palmer, 468 U.S. 517, 526-27 (1984);
Swofford v. Mandrell, 969 F.2d 547, 549 (7th Cir. 1992); Anderson
v. Gutschenritter, 836 F.2d 346, 349 (7th Cir. 1988); Archie v.
City of Racine, 847 F.2d 1211, 1222-23 (7th Cir. 1988) (en banc).

The Eighth Amendment forbids excessive physical force
against prisoners.  Hudson v. McMillian, 503 U.S. 1, 9 (1992).
This is true even when the use of force does not result in
significant injury.  Id.  A jail or prison official who inflicts
force maliciously and sadistically to cause an inmate harm
violates the Eighth Amendment.  Id.

Inmates also have the right to be free from retaliation for
engaging in constitutionally protected conduct, such as
complaining about conditions of confinement.  Walker v. Thompson,
288 F.3d 1005 (7th Cir. 2002); DeWalt v. Carter, 224 F.3d 607,
618 (7th Cir. 2000) ("An act taken in retaliation for the
exercise of a constitutionally protected right violates the
Constitution").

While low staffing levels do not, by themselves, constitute
due process violations, they provide support for a conclusion
that the inmates are treated "recklessly or with deliberate
indifference" to their safety.  Swofford, 969 F.2d at 549.
Similarly, although overcrowding is not a per se constitutional
violation, overcrowding resulting in bunking multiple inmates in
a single cell without adequate safety, space, sanitation,
bedding, or opportunities for activities outside the cells can
amount to unconstitutional conditions of confinement.  French v.
Owens, 777 F.2d 1250, 1252-53 (7th Cir. 1985) (holding that
overcrowding was unconstitutional where it led to unsafe and
unsanitary conditions); Wellman v. Faulkner, 715 F.2d 269 (7th

- 7 -

Cir. 1983) (holding that prison was unconstitutionally overcrowded); see also Nami v. Fauver, 82 F.3d 63, 67 (3d Cir. 1996) (holding that double-bunking coupled with extended in-cell periods despite safety hazards could constitute a constitutional violation).

A jailer's deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment. Estelle v. Gamble, 429 U.S. 97, 102 (1976); Maggert v. Hanks, 131 F.3d 670, 671 (7th Cir. 1997). "Deliberate indifference" involves both an objective and a subjective component. The objective component is met if the deprivation is "sufficiently serious." Farmer, 511 U.S. at 834. Prison officials may not refuse, unreasonably delay, or intentionally interfere with medical treatment for incarcerated individuals. Hudson v. McHugh, 148 F.3d 859 (7th Cir. 1998) ("[T]his is the prototypical case of deliberate indifference, an inmate with a potentially serious problem repeatedly requesting medical aid, receiving none, and then suffering a serious injury."); Zentmyer v. Kendall County, 220 F.3d 805 (7th Cir. 2000). "Deliberate indifference can be evidenced by 'repeated examples of negligent acts which disclose a pattern of conduct by the prison medical staff' or it can be demonstrated by 'proving there are such systemic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to adequate medical care.'" Wellman, 715 F.2d at 271 (citing Ramos v. Lamm, 639 F.2d 559, 575 (10th Cir. 1980), cert. denied, 450 U.S. 1041 (1981)). Jail officials also may not provide an easier but less efficacious course of treatment nor may they offer only cursory medical care when the need for more serious treatment is obvious. See Estelle, 429 U.S. at 104-05. Failure to provide medication can violate the duty to provide adequate medical care to address serious medical needs. See, e.g., Zentmyer, 200 F.3d at 811.

The County's obligation to provide adequate medical care includes a duty to provide adequate mental health care. Farmer, 511 U.S. at 832; Sanville v. McCaughtry, 266 F.3d 724, 734 (7th Cir. 2001) (noting that a mentally ill inmate's condition was "objectively, sufficiently serious" such that incarcerating him under conditions that posed a substantial risk that he would commit suicide subjected him to cruel and unusual punishment). In addressing the constitutionally minimal standards for mental health care in a jail or prison, the Seventh Circuit notes: "When a claim is based upon the failure to prevent harm, in order to satisfy the first element the plaintiff must show that the inmate was 'incarcerated under conditions posing a substantial risk of serious harm.'" Id. (citing Farmer, 511 U.S. at 832); see also Estate of Novack v. County of Wood, 226 F.3d 525, 529

- 8 -

(7th Cir. 2000); Estate of Cole v. Fromm, 94 F.3d 254, 261 (7th
Cir. 1996).  Where a jail's "actual practice" towards treatment
of mentally ill inmates in general is clearly inadequate, the
facility may be held to be "on notice" at the time of an inmate's
incarceration that there is a substantial risk of deprivation of
necessary care.  Woodward, 368 F.3d at 927 (practice of
inadequate employee training, incomplete intake screening, and
inadequate suicide watch constituted deliberate indifference).

     The risk of suicide is an "objectively serious harm" from
which inmates have a right to protection, under the deliberate
indifference standard.  Matos v. O'Sullivan, 335 F.3d 553, 557
(7th Cir. 2003).  Inadequate suicide prevention may constitute
deliberate indifference.  Hall v. Ryan, 957 F.2d 402, 406 (7th
Cir. 1992) (noting that prisoners have a constitutional right "to
be protected from self-destructive tendencies," including
suicide); Woodward, 368 F.3d at 929 (fact that no previous
suicides occurred in jail did not negate possibility of a
practice of deliberate indifference toward suicidal detainees);
Cavalieri, 321 F.3d at 620 (holding that the right to be free
from deliberate indifference to suicide was clearly established).

     Inmates are constitutionally entitled to environmental
conditions that do not pose serious risks to health and safety,
including deficient sanitation, inadequate fire safety,
inadequate ventilation, and pest infestation.  Vinning-El v.
Long, 482 F.3d 923, 924-25 (7th Cir. 2007) (holding that
deliberate indifference could be established by inference from
conditions, including floor covered with water, broken toilet,
blood and feces smeared along wall, no mattress to sleep on);
Gillis v. Litscher, 468 F.3d 488, 568 (7th Cir. 2006) ("[A] state
must provide . . . reasonably adequate ventilation, sanitation,
bedding, hygienic materials, and utilities (i.e., hot and cold
water, light, heat, plumbing)."); Board v. Farnham, 394 F.3d 469
(7th Cir. 2005) (requiring adequate ventilation); Isby v. Clark,
100 F.3d 502, 506 (7th Cir. 1996) ("Sanitation, we assume,
includes things like odors and general cleanliness around the
cell.") (emphasis in original); French, 777 F.2d at 1257 (holding
that fire safety is a "legitimate" concern under the Eighth
Amendment); Antonelli v. Sheahan, 81 F.3d 1422, 1432 (7th  Cir.
1995) (requiring adequate pest control).

     In addition, detainees have a right to be free of bodily
restraints, such as shackles or a restraint chair, unless the
facility demonstrates a legitimate penological or medical reason
for the restraint.  Murphy v. Walker, 51 F.3d 714, 718 (7th Cir.
1995).  Where restraints are used, the inmate should be properly
monitored and the length of restraint-time should be limited to

- 9 -

ensure the inmate's safety.  <u>French</u>, 777 F.2d at 1253-54.
Restraints imposed by correctional officers that are medically
unjustifiable and have no adequate security rationale infringe on
an inmate's due process rights.  <u>Wells v. Franzen</u>, 777 F.2d 1258,
1263 (7th Cir. 1985) (restraint of a suicidal inmate).

## III.  FINDINGS

We find that CCJ fails to adequately protect inmates from
harm and serious risk of harm from staff and other inmates; fails
to provide inmates with adequate medical and mental health care;
fails to provide adequate suicide prevention; fails to provide
adequate fire safety precautions; and fails to provide safe and
sanitary environmental conditions.

## A.   INADEQUATE PROTECTION FROM HARM

Corrections officials must take reasonable steps to
guarantee inmates' safety and provide "humane conditions" of
confinement.  <u>Farmer</u>, 511 U.S. at 832.  Providing humane
conditions requires that a corrections system must satisfy
inmates' basic needs, such as their need for safety.
Additionally, jail officials have a duty to take reasonable steps
to protect inmates from physical abuse.

To ensure reasonably safe conditions, officials must take
measures to prevent the use of unnecessary and inappropriate
force by staff.  Officials must also take reasonable steps to
protect inmates from violence at the hands of other inmates.  In
addition, officials must provide adequate systems to investigate
incidents of harm, including staff misconduct and alleged
physical abuse of inmates.  Finally, a jail has an obligation to
protect vulnerable inmates from harm, such as those who are at
risk of suicide or at risk from other inmates.  For the reasons
set forth below, CCJ fails to meet constitutional standards in
all of these regards.

### 1.   Inappropriate and Excessive Use of Force

Although the violence present in a correctional setting
necessarily permits the appropriate use of force, the
Constitution forbids excessive physical force against inmates.  A
determination of whether force is used appropriately requires an
evaluation of the need for the use of force, the relationship
between that need and the amount of force used, the seriousness
of the threat reasonably believed to exist, and efforts made to
temper the severity of a forceful response.  <u>Hudson v. McMillian</u>,
503 U.S. 1, 7 (1992).  Generally accepted correctional practices
provide that appropriate uses of force in a given circumstance

- 10 -

should include a continuum of interventions, and that the amount of force used should not be disproportionate to the threat posed by the inmate. Absent exigent circumstances, lesser forms of intervention, such as issuing disciplinary infractions or passive escorts, should be used or considered prior to more serious and forceful interventions.

We found that inmates at CCJ are regularly subjected to inappropriate and excessive uses of physical force. CCJ officers too often respond to inmates' verbal insults or failure to follow instructions by physically striking inmates, most often with the active assistance of other officers, even when the inmate presents no threat to anyone's safety or the security of the facility. Moreover, even in cases in which the initial use of force is reasonable, officers sometimes continue to engage in physical force after the inmate has been brought under control or is effectively restrained.

A top security administrator frankly acknowledged to us the existence of "a culture of abusing inmates" when he came to CCJ in October 2006. While senior management has taken steps to reduce the use of force, such as requiring Use of Force Reports and by subjecting these documents to greater scrutiny, the excessive and inappropriate use of force has not been brought under control. We believe that, despite management's efforts, a culture still exists at CCJ in which the excessive and inappropriate use of physical force is too often tolerated.

Our investigation included an intensive examination of documents provided by CCJ concerning the incidents listed below and a host of others occurring between January 2006 and July 2007. We also conducted a great many staff and inmate interviews. In some cases, our findings of inappropriate or excessive uses of force are in accord with CCJ's own conclusions.

a.   Use of Force in Response to Verbal Altercations

The use of force, while sometimes necessary in a corrections setting, must be appropriate to the given circumstances and proportionate to the threat posed. A verbal taunt from an inmate to an officer is a rule violation and may appropriately result in disciplinary action, but it should not require a physical response. As the examples below demonstrate, verbal altercations with inmates too often provoke physical responses from CCJ officers:

- 11 -

1.   In July 2007, following his hour of exercise, Alberto
     P.[6] refused to return to his cell and a female officer
     locked the cell doors while Alberto remained outside.
     He called the officer a "b----."  When Alberto came out
     with his property to be moved to disciplinary
     segregation for insulting the officer, he was beaten by
     a number of officers.  One officer later told Alberto
     that he had tried to stop the beating, but he just
     "didn't have enough juice" (apparently explaining his
     inability to control the other officers).  CCJ records
     confirm that Alberto was transferred to segregation and
     taken to Cermak for his injuries.

2.   In June 2007, Dennis L. returned to his cellblock after
     a psychological evaluation.  An officer refused to give
     Dennis a dinner tray.  Dennis got into a verbal
     altercation with the officer and threw a cup of liquid
     at him.  A number of officers attacked Dennis in his
     cell.  Emergency Room records indicate that Dennis
     suffered blunt trauma to his head and body, three teeth
     knocked loose, and a laceration to his lower lip from
     this incident.

3.   In April 2007, Billy D. wanted to exit his cell and was
     accused of pushing his way out.  He had a "heated"
     verbal altercation with the officer.  One officer
     struck Billy in the face and other officers joined in.
     Medical records show that Billy required internal and
     external stitches to close a one-inch laceration that
     punctured his lip.

4.   In September 2006, an officer was handing out extra
     lunches to inmates.  Malcolm W. asked for one, but was
     refused.  Malcolm and the officer exchanged verbal
     insults.  A mental health staff member and another
     inmate witnessed the officer slap Malcolm's face and
     drag him from the dorm.  CCJ's Internal Affairs
     Division ("IAD") sustained allegations of abuse, and
     recommended that the officer be suspended for 29 days.
     The officer was "dedeputized" and prohibited from
     carrying a firearm or effecting arrests.

---

     [6]   To protect privacy, we have used pseudonyms to identify
inmates and officers listed in this letter.  Upon request, we
will provide the County with a schedule that cross-references the
pseudonyms with the proper names, where appropriate.

- 12 -

5. In March 2006, Danny P., who according to CCJ records was a slight man of 5'1" and 110 pounds, was on his way to the law library. He got into a shouting match with the female officer escorting him, which resulted in him being taken back to his housing unit. Near the secure staff station, the officer lunged at Danny and began to slap him. Two other officers grabbed his arms and pushed him into a dayroom. As he was being handcuffed, several other officers continued to punch and kick him. He was hit in the mouth after being handcuffed. CCJ records show that a sergeant found Danny standing outside the security office handcuffed and bleeding about the face. The female officer was disciplined for failing to report the incident in a timely manner and also for failing to obtain medical treatment for Danny. Danny filed a lawsuit against CCJ regarding this incident, and the parties agreed to settle the case in March 2008.

   **b.   Use of Force for Failure to Follow Instructions**

   It is inappropriate and excessive to use force for rule violations which do not present a threat to safety or security. At CCJ, inmates' failure to follow orders too often lead to physical abuse, even where no security risk is present:

1. In June 2007, there was a fight on Thomas K.'s unit, in which he did not participate. A group of officers came to the unit, strip-searched the inmates, and sent them back to their cells. As Thomas started to go up the stairs to his top tier cell, his hands were on his neck holding his shirt, instead of on top of his head, as he had been directed. An officer grabbed Thomas by the neck, which choked him, and Thomas reacted by grabbing the officer's arm. The officer immediately swung and hit Thomas in the eye with a walkie-talkie, causing a wound that required five stitches to close. Cermak medical records confirm Thomas's injuries and that he was hit with an "unknown object." The officer continued hitting Thomas after the first blow, although Thomas offered no resistance. We observed Thomas's injuries during our on-site visit.

2. In February 2007, Matthew S. was ordered to leave the barber shop for standing up before his turn. When he tried to explain why he stood up, an officer grabbed him by the collar and told him to leave the barber shop. Matthew argued with the officer. Outside the

- 13 -

barber shop, officers shoved his head into the concrete
after he had been handcuffed. CCJ records confirmed
that Matthew needed stitches to his face and a tetanus
shot following this incident, but he refused treatment.

3.   In April 2006, Terrence M. was being processed in his
     division when an officer noticed that Terrence had an
     unauthorized shirt.  The officer asked for the shirt,
     but Terrence refused to give it to him.  After Terrence
     was restrained, the officers punched and kicked him.
     As a result of the beating, Terrence suffered a broken
     jaw that required surgery at an outside hospital.  CCJ
     found abuse by one officer, and the officer was
     terminated.

4.   In April 2006, Darnell J. refused to go to recreation
     when he was told he could not first use the bathroom.
     Several officers shoved Darnell into the hallway where
     they beat and kicked him.  A sergeant watched and then
     joined in the beating.  Two other inmates in the
     hallway were also beaten.  Darnell was hospitalized for
     neck injuries.  CCJ found abuse by the sergeant and
     seven officers and also that the sergeant and several
     officers had filed false reports.  IAD recommended
     termination for the sergeant and three officers.

5.   In March 2006, John S. was being strip-searched prior
     to going to recreation.  He was tapping on the wall.
     An officer ordered him to stop and hit him on top of
     the head.  John continued to tap.  After John was
     searched, the officer said: "You're f------ guilty"
     and slammed him on top of a cart and against the wall.
     John was pulled into the hallway where other officers
     started to beat him.  He was hit in the face, dragged
     by his hair, choked, and beaten.  Photographs of John
     in the CCJ files show injuries to his face and body.
     IAD found that the officers used excessive force and
     recommended that two officers be terminated.

6.   In March 2006, Jacob D. objected to a tier change and
     insisted on speaking with an officer.  Three officers
     extracted him from his cell.  He was handcuffed behind
     his back and, while they were taking him to the
     segregation unit, the officers pushed his head into the
     wall.  He was hit in the face, thrown down stairs,
     kicked, and punched repeatedly.  Photographs of Jacob
     from the following day show that his face was badly
     bruised and his eye was swollen shut.  IAD found that

- 14 -

three officers used excessive force and recommended
that they be suspended for 29 days.

7.     In January 2006, Byron S. was cleaning the dayroom with
       other inmate workers when a group of officers accused
       Byron and another inmate of planting contraband in the
       visiting area, and took both inmates into the hallway.
       Byron was beaten by multiple officers.  After he was
       handcuffed and lying on the floor, Byron received a
       blow that broke his jaw.  Medical records confirm that
       his jaw was fractured.  Byron's jaw was wired shut at
       an outside hospital, which required him to eat with a
       straw.  Three months later, Byron required additional
       surgery and his jaw was wired shut for a second time.
       Byron filed a lawsuit against CCJ regarding this
       incident, and the parties agreed to settle the case in
       September 2007.

8.     In January 2006, Michael A. was resisting going to
       disciplinary segregation because he believed he had
       already served his time for the infraction in question.
       He asked to talk to a sergeant, who said that nothing
       could be done.  When he continued to resist, stating
       that he wanted to talk to a captain, a correctional
       officer said: "No," and struck him in the face.  Other
       officers were called and joined in beating him.  He was
       sent by ambulance to an outside hospital.  Medical
       records show he suffered a fractured nose and two black
       eyes.

       c.    **Use of Force as Punishment or Retribution**

We found that inappropriate and excessive use of force also
occurs when officers are angry and upset about inmate violence
against staff.  Physical force is also sometimes inappropriately
used at CCJ even after an active dispute between an inmate and
officer has ended, apparently to punish the inmate.  Retaliatory
force even occurs when officers are dealing with mentally ill
inmates with limited impulse control, although the inmates do not
present a threat to themselves or others.[7]  The use of force is

---

[7]     According to a division superintendent, a number of
officers assigned to the tiers for inmates with mental illness
have not received training on working with the mentally ill.  The
excessive use of force with mentally ill inmates is likely
attributable to lack of, or ineffective, officer training.

- 15 -

never appropriate as retribution for previous bad acts and is
inappropriate when an inmate is not a present threat:

1. In July 2007, Robert T., who suffers from mental
   illness, exposed himself to a female officer.  In
   response, he was taken to a clothing room where a group
   of officers handcuffed him and then proceeded to hit
   and kick him after he was restrained.  CCJ records
   confirm that Robert was sent to an outside hospital
   with severe head trauma.

2. In June 2007, Russell G.'s cellmate opened the cell
   door and Russell got out of his cell.  In response, an
   officer locked all the inmates in their cells.  After
   Russell was back in his cell, officers sent his
   cellmate downstairs and entered Russell's cell.  The
   officers handcuffed Russell, then stomped on his back
   and hit him.  His eye became swollen and his teeth were
   chipped.  Before taking him to the dispensary, the
   officers threatened to beat Russell again and charge
   him with battery unless he told medical staff that he
   had hurt himself falling off his bunk.  Russell was
   sent from the dispensary to Cermak Hospital for medical
   treatment.

3. In August 2006, an inmate stabbed an officer.  Because
   Martin S. had argued with the officer earlier in the
   day, officers erroneously believed he had committed the
   stabbing.[8]  As a result, officers responded to an "all
   available" call and began to beat Martin in the
   mistaken belief that he was the inmate who had
   assaulted the officer.  Besides being punched and
   stomped, he was also hit with a radio and kicked in the
   groin.

4. Inmate Andrew B. was also housed in the unit where the
   August 2006 attack on the officer occurred.  Andrew had
   nothing to do with the attack.  A large number of
   officers came onto the unit and proceeded to beat the
   inmates indiscriminately.  Andrew was ordered to lie
   down and, while he promptly obeyed, he was stomped and
   kicked by the officers.

---

[8]   CCJ records confirm that another inmate was charged
with the crime.

- 16 -

5.   In April 2006, Damien H. pushed out of his cell.  An
     officer escorted him back to his cell.  At the door of
     his cell, Damien turned and hit the officer, for which
     he was charged with aggravated battery.  All available
     officers were called and, while restraining Damien,
     several officers punched, kicked, and stomped him.  IAD
     found that three officers had used excessive force and
     recommended 29-day suspensions for all of them.

6.   In January 2006, an officer wanted Jerry M. to return
     to his cell, which Jerry resisted, and the officer
     rolled the door over Jerry's foot.  Jerry called the
     officer a "b----."  The officer then beat Jerry with
     handcuffs wrapped around his hand like brass knuckles.
     A CCJ internal investigation of this incident found
     that excessive force had been used and recommended that
     the officer be terminated.  The Sheriff's Merit Board,
     which hears CCJ termination cases, ruled against CCJ
     and reinstated the officer to duty.

   **d.   Use of Force at Intake**

    The pattern of inappropriate and excessive use of force is
distributed throughout the CCJ divisions, and not confined to the
areas where the use of force is most likely to occur in a
correctional setting:  the maximum security units and intake
area.  However, an especially high number of abuse of force
allegations do emerge from CCJ's RCDC intake unit.

    There is unanimity of opinion among those familiar with CCJ,
including administrators and staff, the County, the Sheriff's
Office, and the court monitors, that conditions in RCDC are
unacceptable and must be changed.  As discussed in more detail
below, the RCDC is chronically overcrowded, cramped, chaotic, and
insufficiently staffed.  The impact of these conditions on the
use of force is considerable.  In the RCDC, inmates who request
attention for various needs run the risk of becoming victims of
physical abuse.  Inmates are especially vulnerable to abuse when
they are taken in large groups to be strip searched in an
isolated area out of the view of non-security intake staff.  Many
inmates report that those who are old, mentally ill, or do not
understand English, are struck by officers for undressing or
dressing too slowly.  Finally, inmates may also be targeted for
physical abuse because of the charges for which they were
arrested.

1.   In September 2006, Pedro S. was arrested on a sex
     charge brought by his niece.  While in the intake area,

- 17 -

three officers who had read his charge began taunting
him, yelling threats in Spanish, and asking if he knew
what was about to happen to him.  The officers struck
him many times and called him a "f------ Mexican."  The
other inmates were ordered to turn and face the wall
"or else."  Because the officers threatened to kill
Pedro if he said anything about the incident, he did
not seek medical attention.  Pedro was released four
days later and immediately saw a doctor and reported
the incident to the Chicago Police Department.  The
Police Department contacted CCJ.  Medical records
confirm that Pedro's injuries included a broken rib and
damage to his jaw and knee.

2.   In July 2006, Lonnie L., 59-years-old, was leaving the
     medical area of intake and heading to the bullpen.
     When he turned around to get more medication, an
     officer told him not to return to the medical area.
     Lonnie did not obey the order.  The officer came into
     the medical area and hit Lonnie on the mouth.  When
     Lonnie fell to the ground, the officer kicked him and
     again struck him in the mouth, knocking out a tooth.
     The officer dragged Lonnie by the pants out of the
     medical area.  During Lonnie's intake strip search, the
     same officer hit him in the back with a cane.  Three
     inmates testified that they witnessed the incident.
     Medical records indicated injury to Lonnie's ribs and
     lung.  CCJ found abuse and recommended that the officer
     be terminated.

3.   While being processed into CCJ in May 2006, Antonio R.
     was wandering around the intake area asking for his
     methadone.  An officer told him to return to his
     holding pen.  Antonio apparently did not obey quickly
     enough, as the original officer and others proceeded to
     beat him, first in the main open area and then in an
     adjoining tunnel.  They hit Antonio with a radio,
     knocked out his dentures and smashed them under a boot.
     As a result of this incident, Antonio suffered multiple
     fractures and a collapsed lung.  After being returned
     from one outside hospital, he was sent to another in
     acute respiratory distress.  He was transferred to a
     Level 1 trauma center, where he needed to be placed on
     a ventilator.  Medical records confirm Antonio's severe
     injuries.

4.   In February 2006, while being processed into the CCJ
     for driving on a suspended license, James W. would not

- 18 -

(and could not) remove jewelry embedded in a piercing because it was permanently soldered.  The officer conducting the strip search attempted to strike James, who blocked the blow.  The officer then called over other officers, who hit James in the face multiple times.  One officer hit him repeatedly with a handcuff wrapped around his hand.  James later stated that the officers had used his head as a "bongo drum."  Medical records confirm that James was diagnosed with a perforated ear drum and blood in his right ear at Cermak Hospital the next day.  Additional records show that the incident resulted in diminished hearing in one of James's ears.  James filed a lawsuit against CCJ concerning this incident and the parties agreed to settle the case in March 2008.

### e.   Inadequate Oversight of Use of Force

Effective measures to prevent excessive and inappropriate uses of force start with the adequate reporting of information to permit the identification of potential problem cases and effective internal investigations.  We find that CCJ fails to elicit adequate information about use of force incidents, making management review ineffective.  We also find that, in most cases, internal affairs investigations of use of force are undertaken only when a lawsuit is filed, rather than when a serious incident occurs.

### i.   Management Review

In order for CCJ to provide adequate oversight of officers' use of force, management must have adequate information to review incidents and reach a conclusion as to the propriety of a use of force.  While all officers involved in a use of force incident fill out a Use of Force Report, in most cases these reports provide very little information because they are written in generalities.  For example, numerous Use of Force reports fail to describe, in factual terms, the type and amount of force that officers used.  Many Use of Force Reports merely describe the force used with phrases such as, "used the least amount of force necessary to gain control of the inmate" or "faced inmate to the floor."  Although most shift commanders review Use of Force and Incident Reports to ensure that reports are completed, some commanders reported that they do not review the reports for substantive content.  Although copies of Incident Reports are forwarded to CCJ's Executive Director, Assistant Executive Directors, Superintendents, and the official file, it is unclear

- 19 -

if the administration routinely conducts any additional review of these reports.

Moreover, while in most cases there are both Incident Reports and Use of Force Reports, the reports generally do not indicate the nature or extent of an inmate's injuries, arguably the most telling indication that there *may* have been an inappropriate use of force.  The reports usually conclude with an inmate being taken for "medical attention," but with no indication of why medical attention was required.  The reports also fail to capture the time the inmate received medical attention, which makes it difficult to assess whether medical attention was promptly provided.  In the May 2006 case of Jacob D., there is no indication of any injury in the CCJ reports, but when Jacob was transferred the next day to the Illinois Department of Corrections ("IDOC"), his facial bruising and swelling was so severe that the IDOC contacted CCJ immediately to report the physical condition of the incoming prisoner.  In the case of John S., there is also no indication of injury in the CCJ reports about a March 2006 incident.  The reports simply state that John was taken for medical attention and released from the dispensary, with no mention of any injuries.  In fact, as photos taken later show, John suffered two black eyes and a swollen lip, among other injuries.  In both of these cases, CCJ eventually found excessive use of force by the officers, but the reports themselves were devoid of helpful information.[9]

Because the information contained in Use of Force and Incident Reports is insufficient for management to determine whether the incident raises suspicions concerning use of force, review by management, when it occurs, usually does not result in identifying cases for investigation.  There can be no effective oversight if necessary information is not put forth when the incident happens.  For example, a report indicating that an inmate sustained a black eye after an inmate-officer altercation should raise concern, but management will never know about the black eye under the current system.

In addition to the lack of information contained in CCJ reports, we discovered that the Incident Reports did not contain a tracking number or source of issuance until a July 2007 initiative by the Executive Director.  This initiative is consistent with generally accepted correctional practice. Previously, it was extremely cumbersome to track any one incident

---

[9]    In both of these cases, investigations were initiated as a result of external complaints.

- 20 -

(for use of force and other serious incidents) and, in all
likelihood, impossible to ascertain if all incidents were being
reported and processed.  Incident tracking numbers are now to be
issued by External Operations staff.  Serious incidents and uses
of force should also be tracked by each division with a uniform
logging system for recording serious incidents at all levels of
CCJ.

     Finally, CCJ has no tracking or early warning system to
identify those officers who are the most frequent users of
physical force and those whose actions have elicited the most
complaints of excessive force, grievances, or injuries.  An
appropriate early warning system is an accountability tool that
allows for early intervention by alerting a facility to a need
for retraining, problematic policies, supervision lapses, or
possible bad actors.  In 2004, CCJ hired an external consulting
firm to review its policies and procedures regarding the use of
force after a special grand jury concluded that a 1999 incident,
in which correctional officers beat and terrorized 49 inmates at
CCJ, constituted "gross, if not criminal, misconduct."  The
consulting report recommended that CCJ institute an early warning
system "as soon as possible."  The 2004 recommendation was never
implemented.

          ii.  Investigations

     To ensure reasonably safe conditions for inmates,
correctional facilities must develop and maintain adequate
systems to investigate staff misconduct, including alleged
physical abuse by staff.  Beyond management review, the avenue
for oversight at CCJ is the Internal Affairs Division ("IAD").
Generally accepted correctional practices require clear and
comprehensive policies and practices governing the investigation
of staff use of force and misconduct.  Adequate policies and
practices include, at a minimum, screening of all Use of Force
and Incident Reports, specific criteria for initiating
investigations based upon the report screening, specific criteria
for initiating investigations based upon allegations from any
source, timelines for the completion of internal investigations,
and an organized structure and format for recording and
maintaining information in the investigatory file.  The
investigation must also be and appear to be unbiased.  CCJ's
investigatory practice fails on multiple levels.

     To be effective, investigations must be undertaken promptly.
A jail, by its nature, has a tremendously high turnover of
inmates.  An inmate whose incident is being investigated may well
have left CCJ if the investigation does not occur soon after the

- 21 -

incident, and the same is true for inmate witnesses.  Because CCJ
does not initiate many use of force investigations, most use of
force investigations are not opened until long after an incident
has taken place.  Instead, investigations are undertaken because
the inmate has filed a lawsuit, which can be up to two years
after an incident occurs.  For example, the investigation of
Michael A.'s January 2006 beating did not begin until 16 months
after the incident, despite the fact that Michael was treated at
an outside hospital, suffered a fractured nose, and had,
according to the medical records, "raccoon eyes."  The
investigation of the incident in which Byron S. suffered a broken
jaw did not start until Byron filed suit seven months later, even
though Byron's visible injuries required him to eat through a
straw with his jaw wired shut.  Because of the delay, inmate
witnesses to the occurrence will likely have left CCJ by the time
an investigation begins.  IAD's only attempt to reach an inmate
witness who has left CCJ is a form letter to a last known
address, which rarely elicits any response.  We found that many
investigations are simply undertaken far too late to be
effective.

     Perhaps even more troubling is the fact that investigations
are reactive and suffer from the appearance of bias.  The vast
majority of IAD files we reviewed stated that the investigation
of use of force was opened at the request of CCJ's attorney in
response to an inmate lawsuit CCJ is defending in court.  It is
almost impossible for IAD to appear fair and unbiased when the
investigation is undertaken only because CCJ is defending an
inmate lawsuit.  All uses of force should be appropriately
reviewed through the chain of command.  Whenever Incident
Reports, Use of Force Reports or other information raise the
possibility that excessive force was used, such incidents should
be thoroughly investigated by IAD.  In particular, incidents
involving suspicious inmate injuries, such as black eyes or blunt
head trauma, and incidents requiring medical care at an outside
hospital should be investigated by IAD.  An appropriate
evaluation of incidents for investigation will require more
detailed Use of Force and Incident Reports and a more thorough
management review than CCJ's current practice.

     IAD also reported a backlog in resolving use of force cases
and incidents involving inmate-on-inmate assaults because it is
difficult to obtain medical releases from Cermak, CCJ's on-site
health care provider, in a timely manner.[10]  Obtaining medical

---

     [10]     IAD is under the Sheriff's Office while Cermak is part
of the Cook County Bureau of Health.

- 22 -

records from Cermak can take anywhere from six to 12 months, which prevents IAD from bringing prompt closure to an investigation.  This type of delay is totally unacceptable, and is devastating for any investigation.

We also found that there are attempts by officers or other staff to conceal the inappropriate or excessive use of force. CCJ officials found that the officer involved in the January 2006 beating of Jerry M. had attempted to persuade a sergeant on the tier to change his story as to what had happened.  In another case, Russell G. reported that the officer who caused his injuries in June 2007 threatened him with worse treatment unless he told the medical staff that he had hurt himself by falling out of his bunk.  We found two accounts of senior division staff attempting to dissuade inmates from complaining about the use of force, in one case by the offer of a favor and in the other by the threat of criminal charges.  CCJ's administration and IAD must take action to ensure that inmates are not intimidated into concealing excessive use of force and that information received is accurate and credible.

Finally, we also found flawed investigatory techniques at CCJ.  For example, investigators often do not give sufficient attention to the inmate injuries that are known.  When investigators question officers accused of using excessive force, the officers are generally not even questioned as to how an inmate's particular injury might have occurred.  For example, IAD opened an investigation of the March 2006 case of Antonio R. after a doctor at an outside hospital reported that Antonio was in serious condition with "blunt trauma all over his body." Although the investigator was aware of Antonio's injuries at the time he questioned both of the officers involved, he never asked the officers about the nature of Antonio's injuries or how they occurred.  While there may sometimes be tactical reasons to avoid discussing inmate injuries when an officer is first questioned, the investigation is incomplete if the officers are never asked to address the inmate's resulting injuries.

We found other examples of investigatory techniques that are unlikely to result in complete or credible information.  For example, on March 9, 2006, an investigator interviewed inmate Gabriel M. about a use of force incident involving another inmate in his tier.  The investigator then attempted to interview Gabriel's cellmate about the same incident but, since the cellmate could not speak English, the investigator utilized Gabriel as the Spanish interpreter to provide his cellmate's statement.  Relying on one inmate to translate for another inmate in an investigation involving both of them is a poor

- 23 -

investigatory technique that calls into question the credibility of the information gathered by CCJ investigators.[11]

### iii. Videocameras and Overhead Cameras

When properly utilized, cameras in a correctional setting can augment inmate safety and security and provide essential information for investigations.  Certainly video surveillance should never be used to substitute for direct officer supervision of inmates, but it often is helpful to supplement supervision and for incident reconstruction.  CCJ has limited and antiquated live feed overhead cameras in some divisions, but the cameras do not have the critical capability to record and replay, and most do not capture activities outside of the housing unit dayrooms. Moreover, while there are two small monitors in the RCDC intake area, we discovered that the officers in the Security Office were unaware that the monitors could view various parts of the intake area.  The cameras, installed to monitor activity in a part of CCJ that had experienced among the highest number of allegations of excessive and inappropriate uses of force, were not being used.

Procedures at CCJ require that a handheld videocamera be brought to the scene of any use of force and that the use of force be recorded.  While this policy is helpful for review of cell extractions and other planned uses of force, it is not surprising that the use of handheld videocameras has not been an effective means of oversight for unplanned uses of force.  None of the numerous videotapes we reviewed captured an unplanned use of force in progress.  Improvements and additions to CCJ's video surveillance system, including the ability to record for retrieval following an incident, would be a much more effective oversight mechanism.

### 2.  Deficient Inmate Safety and Supervision

CCJ does not provide adequate inmate supervision, which exposes inmates and staff to unsafe conditions.  Lack of adequate

---

[11]    Title VI of the Civil Rights Acts requires that recipients of federal funds take reasonable steps to provide meaningful access to limited English proficient communities. Given Cook County's growing Hispanic population, CCJ should ensure that some investigators and correctional officers are familiar with rudimentary Spanish.  In addition, CCJ staff would benefit from receiving diversity training.  See Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq.

- 24 -

security staff, insufficient direct supervision in the majority
of the housing units, a dilapidated physical plant, inadequate
policies and procedures, and an overcrowded environment combine
to result in an unsecure facility that is dangerous for everyone
on the premises.  On April 9, 2007, the John Howard Association
found that the rates of injuries to CCJ inmates and staff have
increased significantly in the past decade, despite a substantial
decrease in inmate population.[12]  In 2006, inmate injuries
occurred at the highest rate since the John Howard Association
began gathering data, and staff injuries reached the third
highest rate since 1991.[13]  Our review of CCJ documents revealed
that between January 1, 2007 and June 19, 2007, IAD opened
approximately 254 cases involving inmate assault and/or battery
and five cases of sexual assault.  In 2006, IAD opened
approximately 357 cases involving inmate assault, battery, or
sexual assault.

Insufficient inmate supervision has been a serious problem
at CCJ for decades.  Inmate supervision is seriously compromised
by chronic overcrowding and under-staffing.  The federal district
court monitoring the Duran Consent Decree has repeatedly cited
CCJ for failing to provide adequate security staff to ensure safe
and secure conditions at the facility.[14]  In September 2006,
then-Sheriff Michael Sheahan admitted that the Jail is "severely
understaffed."[15]  The John Howard Association's April 9, 2007
report found that CCJ would require an additional 189 new
correctional officers and suitable replacements for the 130 to

---

[12]     Court Monitoring Report, Duran v. Dart, No. 74-C-2949,
at 115-16 (N.D. Ill. Apr. 9, 2007) ("2007 Court Monitoring
Report").  Monthly averages for staff injuries have risen from
6.6 in 1996 to 28.3 staff injuries per month in 2006.

[13]     Id. at 116.  Monthly averages for inmate injuries
increased from 14.7 injuries per 1000 inmates in 1996 to 27.8
injuries per 1000 inmates1 in 2006.

[14]     Leonard N. Fleming, "Federal Judge Warns County to Fix
Overcrowding at the Jail," Chicago Sun Times, Dec. 1, 2007;
Jonathan Lipman, "Judge Blasts Staffing at Jail," Daily
Southtown, Dec. 29, 2005.

[15]     Joint Status Report, Duran v. Dart, No. 74-C-2949, at 8
(N.D. Ill. Sept. 29, 2006).

- 25 -

152 correctional officers on inactive status[16] to comply with the
Duran Consent Decree and "good correctional practices."[17]  CCJ's
Post Analysis Reports and Divisional Staffing Reports for April
through June 2007 revealed that at least 172 correctional officer
positions at CCJ were vacant or inactive.  Although the External
Operations Unit, which is responsible for the security of the CCJ
perimeters, the Emergency Response Team, the Canine Unit, and the
transportation of 800 to 1500 inmates to and from court daily,
has an authorized security staffing complement of 420 positions,
on May 1, 2007, the actual External Operations manpower
availability comprised 352 positions.  Our expert consultant
found that the level of correctional staff available to supervise
housing units at CCJ is woefully inadequate.

The lack of adequate staff is magnified by the fact that CCJ
is chronically overcrowded.  In fact, every day from June 2006
through April 2007, numerous inmates were required to sleep on
the floor of two-person cells that housed three inmates.[18]
Divisional reports for the period of February 26, 2007 through
June 17, 2007 reflect that an average of 485 inmates were forced
to sleep on the floor each night.  During our site visit on July
23, 2007, Division VI held 1268 inmates in space with a rated
capacity of 992 inmates.[19]  Dormitory Four in Division II is
operating at twice its design capacity.[20]  However, we did not
observe any increase in security staffing levels or enhanced
supervision practices within the overcrowded divisions.

Overcrowding has an impact on security at CCJ.  For example,
the week of March 19, 2007, CCJ had more inmates sleeping on the
floor (591) than any other week in the four-month period of March
through June 2007.  During that week, CCJ also had the most
fights (35), the most uses of force (27), and found the third
most "shanks" (homemade knives) (34) and second most weapons

---

[16]   Correctional officers on "inactive status" include
persons on disability, suspension, leave of absence, military
leave, or leave for a duty injury.

[17]   2007 Court Monitoring Report at 84.

[18]   Id. at 12.

[19]   The actual capacity of Division VI was much lower than
992 on July 23, 2007, due to numerous cell closures because of
maintenance problems, which further exacerbated the overcrowding.

[20]   2007 Court Monitoring Report at 15.

- 26 -

(12), of any other week during the same period.[21]  On November
30, 2007, Judge Virginia Kendall for the United States District
Court for the Northern District of Illinois apparently chastised
the County and Sheriff's Office for failing to ease overcrowding
at CCJ, stating:  "This is no longer a budget problem.  It is a
constitutional violation."[22]  Despite the fact that CCJ has been
subject to the Duran Consent Decree for 25 years, the County and
the Sheriff's Office have been unable to solve the problems of
overcrowding and inadequate supervision at CCJ.

    CCJ has taken some unusual steps to try to deal with the
problems of overcrowding and inadequate staffing.  The practice
of cross watching, discussed below, is an unacceptable and
dangerous approach.  A recently instituted policy of extended
lockdowns is similarly unacceptable.  In the spring of 2007, CCJ
implemented extended lockdown periods for all general population
inmates.  Under this system, only half of the inmates in each
housing tier were allowed out of their cells during each shift.
Generally, this meant that half of the inmates were allowed out
of their cells for a period in the morning, half of the inmates
were allowed out of their cells for a period in the afternoon and
evening, and all of the inmates were locked in their cells during
the night.  Because the groups of inmates rotated on a shift by
shift basis, the result was that every other day each group of
inmates spent a continuous 26-hour period locked inside the
cells.  This practice was applied indiscriminately to all general
population inmates, except those housed on the medical units.  As
discussed in further detail below, in addition to constituting an
unjust restriction on pre-trial detainees, the extended lockdown
practice interfered with medical and mental health care,
programs, and the grievance system.  Moreover, deficient
maintenance in many cells (no lighting, plumbing failures, etc.)
resulted in inhumane conditions for an extended lockdown.
Therefore, as a result of CCJ's inadequate supervision, inmates
are subjected to unjustified, prolonged periods of in-cell
confinement.  Following our July 2007 visit, the Sheriff's Office
informed us that CCJ had revised the lockdown policy to decrease
the length of the in-cell periods.  This would be an improvement

---

    [21]   Weekly averages for March through June 2007 were:  23.5
fights, 17 uses of force, 23.5 shanks, and 6.6 weapons.

    [22]   Staff Writer, "Judge Orders Cook County to Fix Jail
Overcrowding," PR Newswire Europe, Nov. 30. 2007; Leonard N.
Fleming, "Federal Judge Warns County to Fix Overcrowding at the
Jail," Chicago Sun Times, Dec. 1, 2007; Notification of Docket
Entry, Duran v. Dart, No. 74-C-2949 (N.D. Ill. Nov. 30, 2007).

- 27 -

and a welcome change, and we look forward to assessing the new lockdown system.[23]

As discussed below, the result of CCJ's inadequate inmate supervision is that inmates and staff are exposed to unsafe conditions, an increased risk of violence and an abundance of dangerous and illegal contraband.

### a.   Assaults on Inmates and Staff

The severity and frequency of inmate-on-inmate assaults demonstrate that CCJ is not providing for the safety and well-being of the inmates.  In a period of less than two months in the spring of 2006, inmates reportedly engaged in at least seven separate knife fights that resulted in serious injuries to at least 33 inmates and seven correctional officers, including one inmate death.[24]

Weekly Divisional Reports from February 26, 2007 through June 17, 2007 show an average of 23.5 inmate fights and 3 incidents of "battery to staff with injury" per week at CCJ. Many of these incidents occurred in CCJ's maximum security divisions, where inmates should be supervised at the highest level, and extra precautions should be taken to minimize access to, and creation of, shanks and other weapons.  Clearly CCJ cannot be expected to prevent all altercations between inmates. Nevertheless, the Constitution requires correctional officers and Cook County officials to take "reasonable steps to protect

---

[23]   CCJ's latest attempt to deal with overcrowding involves a "hot bunking" pilot program whereby inmates volunteer to take turns using the same bed in eight-hour shifts.  See Sheriff's Supplemental Report, Duran v. Dart, No. 74-C-2949, at 2 (N.D. Ill. Jan. 15, 2008).  Although each inmate is reportedly using his or her own bedding, the hot bunking procedure could result in serious sanitation and infection control problems, as well as possible inmate-to-inmate intimidation regarding potential volunteers.

[24]   See e.g., William Lee, "Two Cook County Jail Inmates Were Stabbed During a Fracas in a Maximum-security Division Monday Night," Daily Southtown, May 2, 2006; Lori Rackl, "2 Inmates in Hospital After Jail Brawl," Chicago-Sun Times, Apr. 24, 2006; William Lee, "Seven Inmates at Division 11 are Injured by Homemade Knives in a Gang-Related Fight," Daily Southtown, Apr. 24, 2006; Staff Writer, "Knife Fights in Cook County Jail Injure 17," Chicago Tribune, Mar. 13, 2006.

- 28 -

inmates from violence at the hands of other inmates." <u>Goka v.</u>
<u>Bobbitt</u>, 862 F.2d 646, 649-50 (7th Cir. 1988).  The level of
inmate-on-inmate and inmate-on-staff violence that is occurring
within CCJ is so unacceptably high that it is clear that inmates
are not adequately supervised, in accordance with generally
accepted correctional standards.  Notably, just as the Court and
CCJ staff have recognized the shortage of staff supervision,
inmates are also aware that they could engage in violence with
little to no supervision.  Much of the violence at CCJ involves
group attacks, which reflect some degree of planning and
coordination by the inmates, without the staff's knowledge or
intervention.

     As the following examples demonstrate, CCJ is not meeting
its constitutional obligations to provide for the safety and
well-being of its inmates:

  1.   On December 29, 2007, multiple inmates suffered stab
       wounds during a fight in a Division IX dayroom.  Six
       inmates required treatment from outside hospitals and
       two inmates were admitted to the hospital with multiple
       stab wounds and other serious injuries.  Officers were
       required to use Oleoresin Capsicum spray ("OC spray")
       to break up the fight.  CCJ recovered four shanks, some
       of which measured six inches in length, and another
       weapon in the tier.  Despite the severity of this
       incident, IAD did not open an investigation file.

  2.   On June 26, 2007, an officer delivering breakfast trays
       found inmate Louis J. unconscious on the floor of his
       cell in Division IX.  Louis J. was admitted to the
       hospital for trauma and died on July 8, 2007, as a
       result of his injuries.  Hospital records showed a
       hematoma with fractures and wounds to the face and
       head.  Although the Incident Report related to this
       incident states that Louis J. may have suffered a
       seizure, Louis J.'s cellmate was promptly transferred
       to CCJ's highest level of disciplinary segregation, the
       Level IV Special Incarceration Unit in Division IX.
       However, CCJ could not produce a disciplinary citation,
       hearing record, or investigation documentation on the
       incident.[25]  Louis J.'s cellmate was still in the

---

     [25]   We requested all documentation related to this incident
on multiple occasions.  We never received any disciplinary or
investigation records.  CCJ did not complete a mortality review
for Louis J., allegedly because he was no longer in custody at

- 29 -

Special Incarceration Unit a month after the incident, during our July 2007 site visit.

3.  On June 26, 2007, officers noticed that several inmates from Tier 4B were running as they returned from the Division X gymnasium.  Officers found several inmates with stab wounds and other injuries in the corner of the gymnasium.  One inmate was hospitalized with a stab wound to the neck and another inmate had a broken jaw. The fight was apparently the result of different gang affiliations mixed within the tier.  Upon investigating, officers recovered three shanks.  CCJ placed the entire 48-inmate tier on extended lockdown from June 26 through July 8, 2007, wherein each inmate was allowed out of his cell for only one hour per day, and only one inmate was allowed out at a time.  No other obvious precautions were taken to address the gang problem on the tier.  When the lockdown ended on July 8, another fight broke out involving some of the same inmates and the same gangs as the June 26 incident.  One inmate was stabbed and officers recovered another shank.

4.  On June 20, 2007, inmates Auben J. and Sam D. suffered injuries to their heads and faces following a fight in the outdoor area of Tier A-H in Division IX.  Because no officers witnessed or responded to stop the fight, it was eventually broken up by another inmate, Roger R. Officers only learned of the fight after observing Auben J. bleeding from the head when he returned from exercise.  Because Roger R. admitted that he helped separate the fighting inmates and injured Auben J. in doing so, he was transferred to disciplinary segregation along with Auben J. and Sam D.

5.  On May 10, 2007, seven inmates were treated for stab wounds after a gang-related fight involving approximately 25 inmates in the Division IX, Tier 3C, dayroom.  Inmates Mark V., Alex W., and Arthur A. had to be transferred to outside hospitals for medical treatment.  CCJ staff found a shank in the dayroom.

6.  On December 5, 2006, 31-year-old Marcus K. was found dead in his cell.  His cellmate was charged with first-degree murder for allegedly strangling Marcus K.

---

the time of his death.

- 30 -

after the two were heard arguing.  The two men were
locked in their cell at the time, and other inmates in
the common area alerted a correctional officer that an
inmate needed help during the altercation.

7.   On April 22, 2006, inmate Izzy J. suffered a fatal stab
     wound to the head during a gang-related fight involving
     approximately 20 inmates in Division XI.  Six other
     inmates were hospitalized after the brawl; five of the
     inmates were stabbed with shanks.

8.   On April 2, 2006, inmates Tyson D. and Freddy R. were
     seriously injured during a gang-related fight involving
     at least six other inmates in Division XI.  Both Tyson
     D. and Freddy R. were admitted to the hospital with
     multiple stab wounds to the back.

In addition to the inmate-on-inmate violence, CCJ's security
failings put staff in danger as well:

1.   On March 22, 2007, maximum security inmate Reed W.
     stabbed a correctional officer, a nurse, a hospital
     patient, and a bus driver during an unsuccessful escape
     attempt at Stroger Hospital, where he had been taken
     for a doctor's appointment.  CCJ officials reported
     that Reed W. may have smuggled a shank out of CCJ
     Division IX in his rectum.

2.   On August 16, 2006, correctional officer Ben W. was
     hospitalized for five days and required 30 stitches
     after being attacked by inmate Daniel M. in Division V.
     The inmate was able to run from the scene before any
     other officers could come to Officer W.'s aid.

3.   On April 15, 2006, six officers received medical
     treatment, and at least four inmates were hospitalized
     for stab wounds, after a multiple-inmate fight broke
     out in a Division XI dayroom.  Officers recovered
     several wooden sticks and at least one metal shank
     following the fight.

   b.   Inadequate Security Staffing

As a result of insufficient security staffing, CCJ is not
providing adequate supervision of the inmate housing areas.  As
discussed above, a major concern surrounding inmate supervision
is the practice of "cross watching."  Cross watching refers to
the practice of having one correctional officer simultaneously

- 31 -

supervise two tiers of cells as opposed to one.[26]   The
correctional officer monitors the second tier on camera while
stationed in the first tier's control center.  By policy, the
officer supervising a housing unit is supposed to conduct
security rounds inside the unit every 30 minutes, which allows
him to check on inmates in their cells and in the shower and
bathroom areas.  These areas are not visible on the security
monitors or from the officer's standard post inside unit's
control center.  However, if or when the officer conducts a
security check inside the first housing unit, the second housing
unit is unsupervised.  If the officer leaves the control center
of the first housing unit to conduct a check of the second
housing unit, the inmates in the first housing unit can see that
there is no officer supervising their actions.[27]  Although we
recognize that CCJ has made efforts to increase staffing levels
in housing units and decrease cross watching, we observed
numerous instances of cross watching during our June and July
2007 visits to CCJ.  The practice is highly utilized during lunch
periods, but we also observed cross watching throughout the day.

       As noted earlier, because inmates are aware when there is
not an officer in the housing unit, there is a higher risk for
illicit inmate behavior, including inmate assaults, production of
weapons, and gang and drug activity.  For example:

1.     On May 15, 2007, an officer was cross watching two
       tiers in Division IX, a maximum security division.
       Inmate Carson T. was assaulted by five or six inmates
       in the tier dayroom.  He received multiple wounds to
       his shoulders, back, face, and was admitted to the
       hospital.  The cross watching officer did not notice
       anything amiss until he saw inmate Carson T. pacing by
       the tier door.  CCJ documents noted that Carson T. had
       "injuries resulting from being attacked with a homemade
       knife" and that a "small piece of metal was sticking
       out [his] back."  During the subsequent investigation,
       security staff found two shanks in the tier.  No
       officer observed the dayroom assault.

_____

[26]    Cross watching is prohibited by the <u>Duran</u> Consent
Decree and the John Howard Association has cited CCJ for the
practice, but it continues to occur.  <u>See</u> 2007 Court Monitoring
Report at 86.

[27]    The number of inmates per housing unit varies across
divisions, but it is not unusual for one cross watching officer
to be responsible for more than 90 inmates in two units.

- 32 -

2.  On May 10, 2007, also in Division IX, an officer was
    cross watching two tiers when a disturbance involving
    25 inmates occurred.  Seven inmates received injuries
    including multiple lacerations and puncture wounds.

3.  On December 24, 2006, the assigned officer was cross
    watching two tiers in Division VI when inmate George W.
    assaulted inmate Otis F., causing a head injury.

4.  On July 25, 2006, inmate Andrew K. committed suicide in
    Division I while the assigned officer was cross
    watching two tiers.  The Medical Examiner reported that
    inmates discovered Andrew hanging by the cell bars,
    alerted officers, untied his noose, and initiated chest
    compressions before staff intervened.  Although staff
    reported that sight checks occurred in the tiers on a
    frequent basis, it is not clear if the officer actually
    saw Andrew in his cell at the times reported.
    Inexplicably, the CCJ investigation of the incident did
    not include the results of interviews of the other
    inmates who were present in the tier at the time of
    Andrew's death.

5.  On March 19, 2006, inmate John M. was attacked by two
    other inmates in Tier D-B of Division XI, which at the
    time was a maximum security division.  Because the
    officer assigned to Tier D-B was at lunch, and the two
    closest officers were cross watching Tiers D-B and D-C
    and Tiers D-A and D-D, the officers had to wait for
    back-up to arrive before anyone could enter Tier D-B to
    break up the fight.  John M. suffered two puncture
    wounds to his neck and one puncture wound under his
    arm.  After the fight, officers recovered two steel
    shanks, a broken cane, and three razors from the tier.

   c.  **Contraband and Vandalism**

     Another indicator of inadequate supervision is the amount of
dangerous contraband that is being recovered from the housing
units and the ease by which inmates can fabricate homemade
weapons.  Due to the dilapidated condition of scores of cells,
shower areas, and various dayroom features, inmates have ample
material for fabricating weapons, including floor tiles, metal
from light fixtures, metal from the ventilation system, glass
from cell light bulbs, electrical wiring, and plumbing fixtures.
It is virtually impossible for any correctional facility to
completely deter inmates from obtaining materials for weapons due
to the condition of the physical plant, but the problem at CCJ is