IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil No. 10 C 2946 |
| COOK COUNTY, ILLINOIS; | ) | |
| THOMAS DART, COOK COUNTY | ) | |
| SHERIFF (in his official capacity); | ) | |
| TODD H. STROGER, COOK COUNTY | ) | |
| BOARD PRESIDENT (in his official capacity); | ) | |
| COOK COUNTY BOARD OF | ) | |
| COMMISSIONERS (in their official capacity); | ) | |
| | ) | |
| DEFENDANTS. | ) | |

## AGREED ORDER

### I. INTRODUCTION

1.  On February 16, 2007, the Civil Rights Division of the United States Department of Justice and the United States Attorney's Office for the Northern District of Illinois (collectively, "United States") notified Cook County officials of their intention to investigate conditions of confinement at the Cook County Jail ("the Facility"), pursuant to the Civil Rights of Institutionalized Persons Act, 42 U.S.C. § 1997 ("CRIPA").

2.  On June 18-22, 2007 and July 23-27, 2007, the United States toured the Facility with consultants in the fields of use of force, corrections, correctional medical care, correctional mental health care, fire safety, and environmental health.

3.  Throughout the course of the investigation, the United States received complete cooperation and access to all facilities and documents from the Cook County Board of Commissioners and the Cook County Sheriff's Office.

1

4.     On July 11, 2008, the United States issued a findings letter pursuant to 42 U.S.C. § 1997 that concluded that certain conditions at the Facility violate the constitutional rights of individuals confined at the Facility. The findings letter and the conclusions therein are contested by Defendants. Furthermore, by entering into this Agreed Order, Defendants to this action do not waive the right to contest the July 11, 2008 findings letter or any of the conclusions set forth therein.

5.     Defendants in this action are Cook County, Illinois; the Cook County Sheriff, Thomas Dart (in his official capacity); the Cook County Board President, Todd H. Stroger (in his official capacity); the Cook County Board of Commissioners (in their official capacities); and their successors, contractors, and agents (collectively, "Defendants"). Currently, all corrections and security functions at the Facility are administered by the Cook County Department of Corrections ("CCDOC") under the Cook County Sheriff. Health care services at the Facility are provided by Cermak Health Services of Cook County ("Cermak"), a public entity that is administered by the Cook County Health and Hospitals System Board. Maintenance responsibilities for the Facility's physical plant are handled by the Cook County Department of Facilities Management ("DFM"). Defendants shall ensure that all Cook County agencies will take any actions necessary to comply with the provisions of this Agreed Order.

6.     The United States District Court for the Northern District of Illinois ("Court") has jurisdiction over this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1345, and 42 U.S.C. § 1997. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).

7.     For the purposes of this lawsuit only and in order to settle this matter, Defendants consent to the entry of a finding that the conditions at the Facility necessitate the remedial measures contained in this Agreed Order. As indicated in Section VII of this Agreed Order, the parties consent to a finding that this Agreed Order complies in all respects with the provisions of the Prison Litigation Reform Act, 18 U.S.C. § 3626(a).

8.     No person or entity is intended to be a third-party beneficiary of the provisions of this Agreed Order for purposes of any civil, criminal, or administrative action, and accordingly, no person or entity may assert any claim or right as a beneficiary or protected class under this Agreed Order. This Agreed Order does not create and shall not be the basis of a cause of action for any non-party. This Agreed Order is not intended to impair or expand the right of any person or organization to seek relief against Defendants or their officials, employees, or agents for their conduct. This Agreed Order does not alter legal standards governing any such claims, including those standards established by Illinois law.

2

9.     The purpose of this Agreed Order is to protect the constitutional rights of the inmates
       detained at the Facility. The terms and requirements of this Agreed Order will be
       interpreted to be consistent with the measures necessary to protect the constitutional
       rights of inmates and are not meant to expand or contract the constitutional rights of
       inmates at the Facility.

## II. DEFINITIONS

10.    "The Facility" shall refer to the Cook County Jail, located at 2700 South California
       Avenue, Chicago, Illinois 60608, and shall include Divisions I-VI, VIII-XI, Cermak
       Health Services Building, the Receiving, Classification, and Diagnostics Center
       ("RCDC"), the Residential Treatment Unit ("RTU"), as well as any building that is built,
       leased, or otherwise used, to replace or supplement the Facility.

11.    "DOJ" shall refer to the United States Department of Justice, which represents the United
       States in this matter.

12.    "Effective date" shall mean the date the Agreed Order is signed and entered by the Court.

13.    "Exigent circumstances" shall mean unexpected events or unforeseen occurrences giving
       rise to an emergency situation that can, in the short term, be remedied only by departing
       from what would otherwise be required by this Agreed Order. The overpopulation of the
       Facility with inmates as the result of a continuing and steady rise in inmate population
       over time is not an "unexpected event" or "unforeseen occurrence" within the meaning of
       this definition.

14.    "Hot-bunk," addressed in provision 32.l(iii), means the practice of assigning more than
       one inmate at the Facility to a single bed, so that the two (or more) inmates assigned to
       that bed must sleep on the bed in shifts.

15.    "Include" or "including" shall mean "include, but not be limited to" or "including, but not
       limited to."

16.    "Inmate" or "inmates" shall be construed broadly to refer to one or more individuals
       detained at, or otherwise housed, held, or confined at the Facility.

17.    "Infirmary" shall mean the areas located on the second and third floors of the Cermak
       Building at the Facility, or any successor facility designed to replace these areas.

18.    Consistent with, or in accordance with, the term "generally accepted correctional

standards" shall mean those industry standards accepted by a majority of correctional professionals or organizations in the relevant subject area.

19. "Licensed Correctional Medical Technician" means an individual licensed as Emergency Medical Technician by the Illinois Department of Public Health.

20. "Qualified Medical Professional" shall mean a licensed physician, licensed physician assistant, or a licensed nurse practitioner, who is currently licensed by the State of Illinois to deliver those health care services he or she has undertaken to provide.

21. "Qualified Medical Staff" shall refer to Qualified Medical Professionals and Qualified Nursing Staff.

22. "Qualified Mental Health Professional" shall refer to an individual with a minimum of masters-level education and training in psychiatry, psychology, counseling, social work or psychiatric nursing, who is currently licensed by the State of Illinois to deliver those mental health services he or she has undertaken to provide.

23. "Qualified Mental Health Staff" shall refer to individuals with a minimum of a bachelor's degree and two years of experience providing mental health services.

24. "Qualified Nursing Staff" means registered nurses and licensed practical nurses currently licensed by the State of Illinois to deliver those health services they have undertaken to provide.

25. "Serious suicide attempt" means a suicide attempt that is considered to be either potentially life-threatening or that required medical treatment for serious harm.

26. "Special Management Units" means those housing units of the Facility designated for inmates in administrative or disciplinary segregation, in protective custody, on suicide precautions, or with mental illness.

27. "Suicide Precautions" means any level of watch, observation, or measures to prevent self-harm.

28. "Train" means to instruct in the skills addressed to a level that the trainee has the demonstrated proficiency to implement those skills as, and when called for, in the training. "Trained" means to have achieved such proficiency.

29. "Use of force," means the application of physical, chemical, or mechanical measures on

4

an inmate. "Use of force" shall not include unresisted handcuffing or unresisted shackling of inmates for movement purposes.

30. Throughout this Agreed Order, the following terms are used when discussing compliance: substantial compliance, partial compliance, and non-compliance: "Substantial Compliance" indicates that the relevant Defendant(s) has achieved compliance with most or all components of the relevant provision of the Agreed Order. "Partial Compliance" indicates that compliance has been achieved on some of the components of the relevant provision of the Agreed Order, but significant work remains. "Non-compliance" indicates that most or all of the components of the Agreed Order provision have not yet been met.

## III. SUBSTANTIVE PROVISIONS

Defendants shall take any actions necessary to comply with the substantive provisions of the Agreed Order listed below. The primary responsibility of each substantive provision is assigned to CCDOC, Cermak, or the DFM, respectively. The Parties recognize that there are a number of ways to achieve constitutional minima. In determining compliance with the substantive provisions of this Agreed Order, consideration shall be given to the operational requirements of the Facility and the policies and practices employed by CCDOC, Cermak, and DFM.

## A.   PROTECTION FROM HARM

31. Use of Force by Staff

   a.   CCDOC shall maintain comprehensive and contemporary policies and procedures, in accordance with generally accepted correctional standards, surrounding the use of force and with particular emphasis regarding permissible and impermissible uses of force.

   b.   CCDOC shall maintain use of force policies and pre-service and in-service training programs for correctional officers and supervisors that address the following impermissible uses of force:

      (1)   use of force as a response to verbal insults or inmate threats where there is no immediate threat to the safety of the institution, inmates, or staff;

      (2)   use of force as a response to inmates' failure to follow instructions where there is no immediate threat to the safety of the institution, inmates, or

staff, unless CCDOC has attempted a hierarchy of nonphysical alternatives that are documented;

(3)     use of force as punishment or retaliation;

(4)     use of force involving striking, hitting, or punching a restrained and non-combative inmate;

(5)     use of force against an inmate after the inmate has ceased to offer resistance and is under control;

(6)     use of choke holds on an inmate, unless lethal force is justified; and

(7)     use of inappropriate or excessive force.

c.     CCDOC shall maintain a policy to ensure that staff adequately and promptly report all uses of force, in accordance with generally accepted correctional standards.

d.     CCDOC shall require that use of force reports:

(1)     be written in specific terms in order to capture the details of the incident;

(2)     contain an accurate account of the events leading to the use of force incident;

(3)     include a description of the instrument(s) of restraint or control, if any, and the manner in which it was used;

(4)     note whether an inmate disciplinary report was completed in connection with the incident that prompted the use of force;

(5)     describe the nature and extent of apparent and reported injuries sustained both by the inmate and staff member;

(6)     contain the date and time medical attention was actually provided;

(7)     describe, in detailed, factual terms, the type and amount of force used as well as the precise actions taken in a particular incident; and

6

(8)     note whether a use of force was videotaped. If the use of force is not videotaped, the reporting correctional officer and supervisor will provide an explanation as to why it was not videotaped.

e.     CCDOC shall continue to require prompt review by the shift commander of all use of force reports. The shift commander's review of use of force reports shall include review for completeness and procedural errors, as well as review of the substantive content. If the use of force report does not comply with provision 31.d. of this Agreed Order, the shift commander shall return it to the reporting officer for revision and resubmission until it is compliant. If the shift commander believes a use of force may have been inappropriate or excessive, he or she shall immediately refer the incident for investigation.

f.     CCDOC shall ensure that senior management review of uses of force includes:

(1)     a timely review of medical documentation of inmate injuries, if any is submitted, as provided by Qualified Medical Staff, including documentation surrounding the initial medical encounter, an anatomical drawing that depicts the areas of sustained injury, and information regarding any further medical care;

(2)     the inmate disciplinary report, if any, associated with the use of force; and

(3)     the incident report, if any, associated with the use of force.

g.     CCDOC shall establish criteria that trigger referral for inappropriate or excessive use of force investigations, including but not limited to, documented or known injuries that are extensive or serious; injuries involving fractures or head trauma; injuries of a suspicious nature (including black eyes, injuries to the mouth, injuries to the genitals, etc.); and injuries that require treatment at outside hospitals.

h.     When CCDOC review of use of force reports, and supporting records if applicable, reveals that reports of a use of force are materially inconsistent, conflicting, or suspicious, CCDOC shall refer that use of force incident for internal investigation.

i.     CCDOC shall develop and implement a system to track all incidents of use of force that, at a minimum, includes the following information:

(1) a tracking number;
(2) the inmate(s) name;
(3) housing assignment;
(4) date;
(5) type of incident;
(6) injuries (if applicable);
(7) medical care provided (if applicable);
(8) staff involved;
(9) reviewing supervisor;
(10) external reviews and results (if applicable);
(11) remedy taken (if appropriate); and
(12) administrative sign-off.

j.      CCDOC shall ensure that, promptly following a use of force incident, video or photographs are taken of any and all reported or apparent injuries sustained by inmates and staff. The video or photographs will be maintained and will be included in the investigation package, if applicable.

k.      CCDOC shall establish an "early warning system" that will document and track correctional officers who are involved in use of force incidents and any complaints related to the inappropriate or excessive use of force, in order to alert CCDOC administration to any potential need for retraining, discipline, problematic policies, or supervision lapses. Appropriate CCDOC leadership, supervisors, and investigative staff shall have access to this information and monitor the occurrences. CCDOC senior management shall use information from the early warning system to improve quality management practices, identify patterns and trends, and take necessary corrective action both on an individual and systemic level.

l.      CCDOC shall ensure that a supervisor is present during all pre-planned uses of force, such as cell extractions.

m.      Where there is evidence of staff misconduct related to inappropriate or unnecessary use of force against inmates, CCDOC shall initiate personnel actions and seek disciplinary action appropriately for any correctional officer found to have:

(1)     engaged in inappropriate or excessive use of force;

(2)     failed to report or report accurately the use of force;

8

(3) retaliated against an inmate or other staff member for reporting an inappropriate or excessive use of force; or

(4) interfered or failed to cooperate with an internal investigation regarding use of force in a manner inconsistent with the staff member's statutory or contractual rights.

n. Where there is evidence of staff misconduct related to inappropriate or unnecessary use of force against inmates, CCDOC shall consider, develop, and initiate systemic remedies as appropriate.

o. CCDOC shall maintain accountability policies and procedures for the effective and accurate maintenance, inventory, and assignment of chemical and other security equipment, in accordance with generally accepted correctional standards.

p. CCDOC shall continue to conduct use of force training in accordance with generally accepted correctional standards, including:

(1) CCDOC shall maintain an effective and comprehensive use of force training program.

(2) CCDOC shall continue to ensure that correctional officers receive adequate training in CCDOC's use of force policies and procedures, including de-escalation and defensive tactics relating to use of force.

(3) CCDOC shall continue to ensure that correctional officers receive pre-service and in-service training on reporting use of force and completing use of force reports.

q. CCDOC shall provide a process for inmates to report allegations of the inappropriate or excessive use of force orally to any CCDOC staff member; said staff member shall give the inmate the opportunity to reduce his or her report to writing through a grievance or complaint form without discouragement.

r. Following a use of force, when CCDOC staff transport an inmate to receive medical care by Cermak, as necessary, the CCDOC staff member shall inform the Cermak staff member that the inmate was involved in a use of force.

s. Cermak shall ensure that, when providing medical treatment or assessment to an

9

inmate following a use of force, Qualified Medical Staff document the inmate's injuries, if any, and any medical care provided. Cermak shall provide CCDOC senior management with a brief summary documenting the initial medical encounter following a use of force, including an anatomical drawing that depicts the areas of sustained injury, if any, and information regarding any further medical care.

t.      Cermak shall ensure that Qualified Medical Staff question, outside the hearing of other inmates or correctional officers if appropriate, each inmate who reports for medical care with an injury, regarding the cause of the injury. If, in the course of the inmate's medical encounter, a health care provider suspects staff-on-inmate or inmate-on-inmate abuse, that health care provider shall immediately:

(1)     report the suspected abuse to the Executive Director of the Office of Professional Review or other appropriate CCDOC administrator; and

(2)     adequately document the matter in the inmate's medical record.

32.   Safety and Supervision

a.      CCDOC shall maintain security and control-related policies, procedures, and practices that will result in a reasonably safe and secure environment for all inmates and staff, in accordance with generally accepted correctional standards.

b.      CCDOC shall maintain policies, procedures, and practices to ensure the adequate supervision of inmate work areas and trustees, in accordance with generally accepted correctional standards.

c.      CCDOC shall ensure that security staff conduct appropriate rounds with sufficient frequency to provide inmates with reasonable safety. Rounds shall be conducted at least once every half hour, at irregular intervals, inside each housing unit. In the alternative, CCDOC may provide direct supervision of inmates by posting a correctional officer inside the day room area of a housing unit to conduct constant surveillance. More frequent rounds shall be conducted for special management inmates who require more intensive supervision for security and safety reasons. All security rounds shall be documented on forms or logs that do not contain pre-printed rounding times. Video surveillance may be used to supplement, but must not be used to replace, rounds by correctional officers.

d.      CCDOC shall ensure that security supervisors conduct daily rounds in the inmate

10

housing units, and document the results of their inspections.

e.    Cook County shall increase the use of overhead video surveillance and recording cameras to provide adequate coverage throughout the common areas of the Facility, including the RCDC, all division intake areas, mental health units, special management units, inmate housing units, and in common areas of the divisions.

f.    CCDOC shall maintain a procedure to prevent inmates from possessing or having access to dangerous contraband, including conducting regular inspections of cells and common areas of the housing units to identify and prevent rule violations by inmates.

g.    CCDOC shall review, and revise as applicable, all General Orders ("GOs"), Standard Operating Procedures ("SOPs"), and Post Orders on an annual basis, or more frequently as needed.

h.    CCDOC shall revise policies, SOPs, and post orders for all armed posts to include proper use and safe handling of weapons and provide specific instructions on use of deadly force and when and under what circumstances such force should be used, in accordance with generally accepted correctional standards.

i.    CCDOC shall standardize security policies, procedures, staffing reports, and post analysis reports across the divisions, to the extent possible, taking into account the different security levels and different physical layouts in the various divisions.

j.    CCDOC shall provide formal training on division-specific SOPs to correctional officers in accordance with their assignments, and shall provide further specialized training for officers assigned to Special Management Units. Cermak Hospital shall provide Specialized training for officers assigned to psychiatric units.

k.    CCDOC shall maintain in working order all monitoring equipment at the Facility that is under CCDOC's direct control, including cameras, alarms, radios (hand held), interior and exterior lighting, x-ray and other screening equipment, and walk-through metal detectors. To the extent that the maintenance of any Facility monitoring equipment is under the control of DFM, CCDOC shall promptly report any maintenance needs and DFM shall prioritize its services to ensure that all monitoring equipment is maintained in working order.

11

Case 1:10-cv-02946   Document 3-1   Filed 05/13/10   Page 12 of 60

    l.    Absent exigent circumstances, CCDOC: (i) shall house each inmate assigned to a division that is celled to one permanent bed in a cell and shall not house any inmates (including those assigned to dormitory divisions) such that they are sleeping on the floor, on a mattress on the floor, or in any area not designed or redesigned as sleeping quarters; (ii) shall not house more than two inmates to a single cell (triple-bunking); and (iii) shall not hot-bunk any inmates.

    m.    When exigent circumstances give rise to triple-bunking, CCDOC shall provide the third inmate in the triple-bunked cell a "boat," stackable bunk, moveable platform, or cot, so that the inmate is not required to lay down directly on the cell floor or on a mattress on the floor.

33.    **Security Staffing.**  The parties agree that correctional officer staffing and supervision levels at the Facility must be appropriate to adequately supervise inmates, to carry out the requirements of this Agreed Order, and to allow for the safe operation of the Facility, consistent with generally accepted correctional standards. Cook County and CCDOC shall take such actions as shall ensure that correctional officer staffing and supervision at the Facility are sufficient to achieve these purposes. These actions shall include the following:

    a.    In the fiscal year 2010 budget, Cook County shall allocate funds sufficient to allow for 210 additional correctional officer positions at the Facility. Consistent with provision 33.c, such funding may occur on a rolling basis, as appropriate in light of the time required to hire, train, and put on duty the additional 210 new correctional officers.

    b.    CCDOC shall use its best efforts (through the maintenance of the written staffing plan required by provision 33.h and otherwise) to ensure that the number of correctional officer vacancies is kept to the minimum practicable number at all times, taking into account that the timing of terminations and resignations and the resulting rate of attrition may, in ordinary course, result in there being some vacancies at any given time.

    c.    CCDOC shall fill the 210 additional correctional officer slots provided for in provision 33.a; fill the 285 correctional officer vacancies that existed at the Facility as of July 17, 2009; and fill any correctional officer vacancies coming into existence after that date in the following manner:

        i.    By December 31, 2010, CCDOC shall hire, train, and put on duty at the Facility at least 448 newly qualified correctional officers (in addition to

those on duty as of December 31, 2009).

ii.    By March 30, 2011, CCDOC shall hire, train, and put on duty at the Facility at least 174 newly qualified correctional officers (in addition to those on duty as of December 31, 2010).

d.    The parties agree that for 30 months following the effective date of this Agreed Order, Cook County and CCDOC shall not be required to provide additional correctional officer staffing and supervision at the Facility beyond that which is necessary to ensure that correctional officer staffing and supervision are sufficient to achieve the purposes set out in the introductory paragraph of provision 33 and to comply with provisions 33.a-c above.

e.    Within 30 months of the effective date of this Agreed Order, the CCDOC Monitor shall assess and make a recommendation on whether the correctional officer staffing and supervision levels are appropriate to adequately supervise inmates at the Facility, in accordance with generally accepted correctional standards. If the CCDOC Monitor determines that staffing is inadequate, the CCDOC Monitor will make a recommendation regarding the appropriate number of correctional officer staff. If the parties do not accept the CCDOC Monitor's staffing recommendation, CCDOC and Cook County shall agree to an independent, comprehensive study to determine the appropriate correctional officer staffing and supervision. The parties agree that the results of this staffing study shall provide guidance as to the sufficient number of qualified correctional officers necessary to operate the Facility safely and to carry out the requirements of this Agreed Order.

f.    If the staffing study requires additional correctional officers, Cook County shall allocate funds sufficient to maintain correctional officer staffing levels necessary to carry out the requirements of this Agreed Order and to allow for the safe operation of the Facility, consistent with generally accepted correctional standards.

g.    If the staffing study requires additional correctional officers, and consistent with Cook County's allocation of funds for security staffing, CCDOC shall hire and train sufficient number of qualified correctional officers and other staff to carry out the requirements of this Agreed Order and to allow for the safe operation of the Facility, consistent with generally accepted correctional standards, including:

(1)    Investigative staffing sufficient to meet the internal investigation responsibilities outlined in this Agreed Order;

13

(2)     Correctional officer staffing sufficient to provide inmates requiring treatment with adequate access to appropriate medical and mental health care by providing timely movement of inmates to medical units, transport of inmates who have been referred for outside specialty care, and escort, if necessary, to Qualified Medical and Mental Health Staff on housing units; and

(3)     Qualified staff sufficient to monitor security cameras in real time and allow for supervisory viewing and retrieving at any time.

h.      CCDOC shall maintain a written staffing plan that requires sufficient staffing to carry out the requirements of this Agreed Order and to allow for the safe operation of the Facility, consistent with generally accepted correctional standards.

i.      Absent exigent circumstances, CCDOC shall maintain a practice that does not allow for scheduled, planned, or expected cross-watching (a CCDOC practice of allowing one correctional officer to simultaneously supervise two housing units from the control center of one of the units) at any time on all maximum security and Special Management Units, and during first and second shifts throughout the Facility.

j.      CCDOC may permit cross-watching on third shift in housing units that are not maximum security or Special Management Units only if the Monitor does not object after consultation and review. The Monitor's review of the appropriateness of third-shift cross-watching on a particular housing unit shall be guided by the sufficiency of sightlines between the units being cross-watched, the adequacy of video and/or audio technologies in place, and/or other factors that bear on the safety and security of inmates and staff. If the Monitor later objects to any cross-watching that is in effect because of the Monitor's concerns that cross-watching on a particular housing unit presents an undue risk to the safety and security of inmates and staff, CCDOC shall immediately cease such cross-watching. CCDOC may renew cross-watching on that unit again if, after further consultation with and review by the Monitor, the Monitor does not object to such renewal. Although cross-watching is permitted under the limited circumstances described herein, CCDOC will work to eliminate the practice at the Facility.

14

34.   Incidents and Referrals

a.   CCDOC shall continue to ensure that staff adequately and promptly document all reportable incidents, including inmate fights, rule violations, inmate injuries, suicides and suicide attempts, cell extractions, medical emergencies, contraband, vandalism, escapes and escape attempts, fires, and other incidents causing a disruption to standard CCDOC practice, in accordance with generally accepted correctional standards.

b.   CCDOC shall continue to ensure that correctional officers receive formal pre-service and in-service training on proper incident reporting policies and procedures, in accordance with generally accepted correctional standards.

c.   CCDOC shall maintain a system to track all reportable incidents (as described in provision 34.a) that, at a minimum, includes the following information:

(1)   incident tracking number;
(2)   the inmate(s) name;
(3)   housing assignment;
(4)   date;
(5)   type of incident;
(6)   injuries (if applicable);
(7)   medical care (if applicable);
(8)   primary and secondary staff involved;
(9)   reviewing supervisor;
(10)  external reviews and results (if applicable);
(11)  remedy taken (if appropriate); and
(12)  administrative sign-off.

d.   CCDOC shall require prompt administrative review of incident reports. Such reviews shall include a case-by-case review of individual incidents as well as a systemic review in order to identify patterns of incidents. CCDOC shall incorporate such information into quality management practices and take necessary corrective action.

e.   CCDOC shall ensure that incident reports, use of force reports and inmate grievances are screened for allegations of staff misconduct and, if the incident or allegation meets established criteria, that it is referred for investigation.

15

f.   CCDOC shall maintain policies, procedures and practices requiring investigations to resolve issues identified during review of incident reports, disciplinary hearings, or inmate grievances, and determine appropriate remedies, in accordance with generally accepted correctional standards. At a minimum, CCDOC shall require timely and appropriate investigations of all suicides, serious suicide attempts, inmate-on-inmate violence resulting in serious injury, inmate-on-staff violence, inmate injuries requiring treatment by an outside hospital, inmate injuries of a suspicious nature (including black eyes, injuries to the mouth, injuries to the genitals, etc.), sexual misconduct between inmates, sexual misconduct involving staff, fires, escapes, escape attempts, and deaths.

g.   CCDOC shall ensure that any investigation reports indicating possible criminal behavior will be referred to the appropriate law enforcement authority.

35.   Investigations

Investigations at the Facility are conducted by independent departments under the Cook County Sheriff's Office, including the Office of Professional Review, the Criminal Investigations Unit, and the Sheriff's Police Department. The Cook County Sheriff will assume responsibility for requiring these investigatory units to comply with the relevant provisions of this Agreed Order.

a.   CCDOC shall maintain comprehensive policies, procedures, and practices for the timely and thorough investigation of alleged staff misconduct, in accordance with generally accepted correctional standards.

b.   Internal investigations shall be conducted by persons who do not have supervisory responsibility for the staff member(s) being investigated.

c.   CCDOC shall ensure that all internal investigations will include timely, thorough, and documented interviews of all relevant staff and inmates who were involved in, or witnessed, the incident in question.

d.   CCDOC shall ensure that internal investigation reports shall include all supporting evidence, including witness and participant statements, policies and procedures relevant to the incident, physical evidence, video or audio recordings, and relevant logs.

e.   CCDOC shall ensure that all investigatory staff will receive pre-service and in-service training on appropriate investigations policies and procedures, the

16

investigations tracking process, investigatory interviewing techniques, and confidentiality requirements.

f.      CCDOC shall provide all investigators who will be assigned to conduct investigations of use of force incidents with specialized training in investigating use of force incidents and allegations.

g.      CCDOC shall ensure that the results of each internal investigation shall be documented in an investigation report. CCDOC administration shall review the investigation reports, along with the underlying documentation, and take appropriate action. CCDOC shall implement appropriate remedies based upon the results of internal investigations.

36.    Inmate Disciplinary Process

a.      CCDOC shall maintain policies, procedures, and practices for a formal disciplinary process, including prompt issuance of written disciplinary citations, administrative review and disciplinary reports for alleged minor rule violations, and due process for alleged major rules violations, in accordance with generally accepted correctional standards.

b.      CCDOC shall ensure that inmate disciplinary hearings are conducted in a reasonably private and secure setting.

c.      CCDOC shall ensure that all inmates placed in lock down status are provided with appropriate due process that has been developed and implemented in policies and procedures, in accordance with generally accepted correctional standards. In an emergency, the Executive Director of CCDOC may order a lock down of entire areas of the Facility in order to control the situation and address serious security concerns. In such circumstances, it is not necessary to provide disciplinary hearings to each inmate affected by the lock down. However, lock downs of this nature shall be limited to only the time and scope necessary to address the emergency. For the purposes of this Agreed Order, a "lock down" shall not include the routine instances in which inmates are confined to their cells, including periods of count, over night, shift change, movement, and routine contraband sweeps.

d.      CCDOC shall ensure that the disciplinary board's written record accurately reflects the testimony and discussion from the disciplinary hearing, including any recommendations from a mental health professional regarding the extent to which

17

disciplinary charges are related to an inmate's serious mental illness or suggestions for minimizing the deleterious effect of disciplinary measure on the mental health status of the inmate.

e.  CCDOC shall alert Cermak when inmates are placed in disciplinary segregation or protective custody.

f.  CCDOC shall permit a Cermak Qualified Mental Health Staff member to serve on the disciplinary board.

37.  Classification

a.  CCDOC shall maintain policies and procedures for an appropriate, objective classification system that separates inmates in housing units by classification levels in order to protect inmates from unreasonable risk of harm. The system shall include consideration of an inmate's security level, severity of current charge, types of prior commitments, suicide risk, history of escape attempts, history of violence, and special needs. CCDOC shall use best efforts to anticipate periods of unusual intake volume and schedule sufficient classification staff to timely classify inmates.

b.  CCDOC shall ensure that classification staff have sufficient access to current information regarding cell availability on each division.

c.  CCDOC shall include information on each inmate's assignment to the Special Incarceration Unit "level system" at the Facility in the new Jail Management System, starting with the date the new Jail Management System becomes operational.

d.  CCDOC shall provide training and access to all correctional officer supervisors on the full capabilities of the new Jail Management System's classification and inmate tracking system (or any replacement system).

e.  CCDOC shall provide ongoing internal and external review and validation of the inmate classification system to ensure its reliability and objectivity.

18

38.   Inmate Grievance Procedure

    a.    CCDOC shall maintain policies and procedures to ensure inmates have access to an adequate grievance process and to ensure that grievances may be accessed and filed confidentially, without requiring the intervention of a correctional officer, in accordance with generally accepted correctional standards. These policies and procedures should be applicable and standardized across all the Facility divisions.

    b.    CCDOC shall ensure that the grievances receive appropriate follow-up, including informing the grievant of the outcome, providing a timely written response, and tracking implementation of resolutions.

    c.    CCDOC shall ensure that grievance forms are available on all units and are available in Spanish. CCDOC shall ensure that there is adequate opportunity for illiterate inmates and inmates who have physical or cognitive disabilities to access the grievance system.

    d.    CCDOC shall ensure that inmate grievances are screened for allegations of staff misconduct and, if the incident or allegation meets established criteria, are referred for investigation. A member of the management staff shall review the grievance tracking system regularly in order to identify areas of concern.

39.   Access to Information

    a.    CCDOC shall ensure that newly admitted inmates receive information, through an inmate handbook or orientation video, regarding the following areas: facility rules and regulations; how to report misconduct; how to report sexual abuse or assault; the process for accessing medical and mental health care; emergency procedures; rules for sending and receiving mail; the visitation process; facility schedule; the disciplinary process; and how to seek redress of grievances.

    b.    CCDOC shall ensure that materials on facility rules and services are available for non-literate and non-English speaking inmates.

40.   CCDOC shall provide training and supervision to all correctional officers and supervisors sufficient to implement the provisions of this Agreed Order.

**B.    HEALTH CARE SERVICES:  ELEMENTS COMMON TO MEDICAL AND MENTAL HEALTH**

41.    Inter-Agency Agreement

    a.    CCDOC shall enter into a written Inter-Agency Agreement with Cermak that delineates the mutual responsibilities of each party, relative to the provision of health care to inmates at the Facility.  The Inter-Agency Agreement shall be finalized within 60 days of the effective date of this Agreed Order.

    b.    Cermak shall enter into a written Inter-Agency Agreement with CCDOC that delineates the mutual responsibilities of each party, relative to the provision of health care to inmates at the Facility.  The Inter-Agency Agreement shall be finalized within 60 days of the effective date of this Agreed Order.

42.    Cermak shall provide adequate services to address the serious medical and mental health needs of all inmates, in accordance with generally accepted professional standards.  The term "generally accepted professional standards" means those industry standards accepted by a majority of professionals in the relevant field, and reflected in the standards of care such as those published by the National Commission on Correctional Health Care ("NCCHC").

    a.    Cermak shall develop and implement medical care policies, procedures, and practices to address and guide all medical care and services at the Facility, including, but not limited to the following:

        (1)    access to medical care;
        (2)    continuity of medication;
        (3)    infection control;
        (4)    medication administration;
        (5)    intoxication and detoxification;
        (6)    documentation and record-keeping;
        (7)    disease prevention;
        (8)    sick call triage and physician review;
        (9)    intake screening;
        (10)    chronic disease management;
        (11)    comprehensive health assessments;
        (12)    mental health;
        (13)    women's health;
        (14)    quality management;

20

    (15)    emergent response;
    (16)    infirmary care;
    (17)    placement in medical housing units;
    (18)    handling of grievances relating to health care;
    (19)    mortality review; and
    (20)    care for patients returning from off-site referrals.

b.    Cermak shall develop and implement policies, procedures, and practices to ensure timely responses to clinician orders including, but not limited to, orders for medications and laboratory tests. Such policies, procedures, and practices shall be periodically evaluated to ensure timely implementation of clinician orders.

43.    Medical Facilities

a.    CCDOC will work with Cermak to provide sufficient clinical space, as identified by Cermak staff, to provide inmates with adequate health care to meet the treatment needs of detainees, including:

    (1)    intake screening;
    (2)    sick call;
    (3)    medical and mental health assessment;
    (4)    acute, chronic, emergency, and specialty medical care (such as geriatric and pregnant inmates); and
    (5)    acute, chronic, and emergency mental health care.

b.    Cermak staff shall make known to CCDOC and Cook County its needs for sufficient clinical space, with access to appropriate utility and communications capabilities, to provide inmates with adequate health care to meet the treatment needs of detainees, including:

    (1)    intake screening;
    (2)    sick call;
    (3)    medical and mental health assessment;
    (4)    acute, chronic, emergency, and specialty medical care (such as geriatric and pregnant inmates); and
    (5)    acute, chronic, and emergency mental health care.

c.    Cook County shall build out, remodel, or renovate clinical space as needed to provide inmates with adequate health care to meet the treatment needs of detainees, as identified by Cermak staff, including:

(1)    intake screening;
(2)    sick call;
(3)    medical and mental health assessment;
(4)    acute, chronic, emergency, and specialty medical care (such as geriatric and pregnant inmates); and
(5)    acute, chronic, and emergency mental health care.

d.    Cermak shall ensure that medical areas are adequately clean and maintained, including installation of adequate lighting in medical exam rooms. Cermak shall ensure that hand washing stations in medical areas are fully equipped, operational, and accessible.

e.    Cermak shall ensure that appropriate containers are readily available to secure and dispose of medical waste (including syringes and sharp medical tools) and hazardous waste.

f.    CCDOC shall allow operationally for inmates' reasonable privacy in medical and mental health care, and shall respect the confidentiality of inmates' medical status, subject to legitimate security concerns and emergency situations. Reasonable privacy typically includes sight and hearing privacy from other inmates and hearing privacy from staff that are not providing health care.

g.    Cermak shall make known to CCDOC and Cook County the structural and operational requirements for inmates' reasonable privacy in medical and mental health care. Cermak shall provide operationally for inmates' reasonable privacy in medical and mental health care and shall maintain confidentiality of inmates' medical status, subject to legitimate security concerns and emergency situations. Reasonable privacy typically includes sight and hearing privacy from other inmates and hearing privacy from staff that are not providing health care.

h.    Cook County shall build out, remodel, or renovate clinical space as needed to allow structurally for inmates' reasonable privacy in medical and mental health care, as identified by Cermak and CCDOC staff.

i.    Cook County shall begin construction of the new clinical space within three months of the effective date of this Agreed Order. It is expected that the project will be complete within nine months of the effective date of this Agreed Order. Prior to completion of the new clinical space, Cook County and DFM will work with Cermak to address the most serious concerns regarding clinical space, to the

22

extent possible in the current Facility.

44.   Staffing, Training, Supervision, and Leadership

   a.   Cermak shall maintain a stable leadership team that clearly understands and is
        prepared to move forward toward implementation of the provisions of this Agreed
        Order, with respect to:

        (1)   Medical care; and
        (2)   Mental health care.

   b.   Cermak shall maintain an adequate written staffing plan and sufficient staffing
        levels of health care staff to provide care for inmates' serious health needs,
        including:

        (1)   Qualified Medical Staff; and
        (2)   Qualified Mental Health Staff.

   c.   Cermak shall ensure that all Qualified Medical Staff and Qualified Mental Health
        Staff are adequately trained to meet the serious health care needs of inmates. All
        such staff shall receive documented orientation and in-service training on relevant
        topics, including:

        (1)   Provision of health care in a correctional setting and Facility-specific
              issues; and
        (2)   Suicide prevention, and identification and care of inmates with mental
              illness.

   d.   Cermak shall ensure that Qualified Medical Staff receive adequate physician
        oversight and supervision.

   e.   Cermak shall ensure that all persons providing health care meet applicable state
        licensure and/or certification requirements, and practice only within the scope of
        their training and licensure. Upon hiring and annually, Cermak shall verify that
        all health care staff have current, valid, and unrestricted professional licenses
        and/or certifications for:

        (1)   Medical staff; and
        (2)   Mental health staff.

23

    f.      Cermak will work with CCDOC to develop and maintain a curriculum for initial and periodic training of correctional officers on recognition and timely referral of inmates with medical urgencies, including drug and alcohol withdrawal. Cermak will provide adequate initial and periodic training on these topics to all Cermak staff who work with inmates.

    g.      CCDOC will provide, to all CCDOC staff who work with inmates, adequate initial and periodic training on basic mental health information, including the identification, evaluation, and custodial care of persons in need of mental health care, as well as recognition of signs and symptoms evidencing a response to trauma; appropriately responding to mental illness; proper supervision of inmates suffering from mental illness; and the appropriate use of force for inmates who suffer from mental illness. Such training shall be conducted by a Qualified Mental Health Professional, registered psychiatric nurse, or other appropriately trained and qualified individual.

    h.      Cermak will work with CCDOC to develop and maintain a curriculum for initial and periodic training of correctional officers on basic mental health information, including the identification, evaluation, and custodial care of persons in need of mental health care, as well as recognition of signs and symptoms evidencing a response to trauma; appropriately responding to mental illness; proper supervision of inmates suffering from mental illness; and the appropriate use of force for inmates who suffer from mental illness. Such training shall be conducted by a Qualified Mental Health Professional, registered psychiatric nurse, or other appropriately trained and qualified individual.

    g.      Cermak shall ensure that all health care staff receive adequate training to properly implement the provisions of this Agreed Order, including:

        (1)    Medical staff; and
        (2)    Mental health staff.

45.    Intake Screening

    a.      Cermak shall maintain policies and procedures to ensure that adequate medical and mental health intake screenings are provided to all inmates.

    b.      Cermak shall ensure that, upon admission to the Facility, Qualified Medical Staff or Licensed Correctional Medical Technicians utilize an appropriate medical intake screening instrument to identify and record observable and non-observable

24

medical needs, shall assess and document the inmate's vital signs, and shall seek the inmate's cooperation to provide information, regarding:

    (1)    medical, surgical, and mental health history, including current or recent medications, including psychotropic medications;

    (2)    history and symptoms of chronic disease, including current blood sugar level for inmates reporting a history of diabetes;

    (3)    current injuries, illnesses, evidence of trauma, and vital signs, including recent alcohol and substance use;

    (4)    history of substance abuse and treatment;

    (5)    pregnancy;

    (6)    history and symptoms of communicable disease;

    (7)    suicide risk history; and

    (8)    history of mental illness and treatment, including medication and hospitalization.

c.    Cermak shall ensure that, upon admission to the Facility, Qualified Mental Health Staff, Qualified Medical Staff, or Licensed Correctional Medical Technicians utilize an appropriate mental health intake screening instrument to identify and record observable and non-observable mental health needs, and seek the inmate's cooperation to provide information, regarding:

    (1)    past suicidal ideation and/or attempts;

    (2)    current ideation, threat, or plan;

    (3)    prior mental illness treatment or hospitalization;

    (4)    recent significant loss, such as the death of a family member or close friend;

    (5)    previously identified suicide risk during any prior confinement at CCDOC;

    (6)    any observations of the transporting officer, court, transferring agency, or similar individuals regarding the inmate's potential suicide risk, if such information is communicated to Cermak staff;

    (8)    psychotropic medication history; and

    (9)    alcohol and other substance use and withdrawal history.

d.    Cermak shall ensure that all Qualified Mental Health Staff, Qualified Medical Staff, or Licensed Correctional Medical Technicians who conduct the medical and mental health intake screenings are properly trained on the intake screening process, instrument, and the requirements and procedures for referring all qualifying inmates for further assessment.

25

e.   If Cermak assigns Licensed Correctional Medical Technicians to perform intake screening, they shall receive appropriate, on-site supervision by on-site Qualified Medical Staff; information obtained on screening for all inmates will be reviewed by Qualified Medical Staff before the inmate departs the intake area.

f.   Cermak shall ensure that a medical assessment based on the symptoms or problems identified during intake screening is performed within two working days of booking at the Facility, or sooner if clinically indicated, by a Qualified Medical Professional for any inmate who screens positively for any of the following conditions during the medical or mental health intake screenings:

   (1)   Past history and symptoms of any chronic disease included on a list specified by Cermak's policies and procedures;
   (2)   Current or recent prescription medications and dosage, including psychotropic medications;
   (3)   Current injuries or evidence of trauma;
   (4)   Significantly abnormal vital signs, as defined by Cermak's policies and procedures;
   (5)   Risk of withdrawal from alcohol, opioid, benzodiazepine, or other substances;
   (6)   Pregnancy;
   (7)   Symptoms of communicable disease; and
   (8)   History of mental illness or treatment, including medication and/or hospitalization.

g.   Cermak shall ensure that any inmate who screens positively for mental illness or suicidal ideation during the intake process receives a comprehensive mental health evaluation (see provision 59.c, "Mental Health:  Assessment and Treatment") Cermak shall ensure timely access to a Qualified Mental Health Professional for this purpose, based on emergent, urgent, and routine medical or mental health needs.

h.   Cermak shall ensure that the intake health screening information is incorporated into the inmate's medical record in a timely manner.

i.   Cermak shall implement a medication continuity system so that incoming inmates' medication for serious medical and mental needs can be obtained in a timely manner, as medically appropriate.  Within 24 hours of an inmate's booking at the Facility, or sooner if medically necessary, a Qualified Medical Professional

26

or Qualified Mental Health Professional, with appropriate prescribing authority, shall decide whether to continue the same or comparable medication for serious medical and mental health needs that an inmate reports during intake screening that she or he has been prescribed. If the inmate's reported medication is discontinued or changed, other than minor dosage adjustments or substitution of a therapeutic equivalent, a Qualified Medical Professional or Qualified Mental Health Professional, with appropriate prescribing authority, shall evaluate the inmate face-to-face as soon as medically appropriate, and within no greater than five working days, and document the reason for the change.

46.   Emergency Care

    a.   Cermak shall train health care staff to recognize and respond appropriately to health care emergencies, including:

        (1)   Medical emergencies;
        (2)   Mental health emergencies; and
        (3)   Drug and alcohol withdrawal.

    b.   CCDOC shall train correctional officers to recognize and respond appropriately to health care emergencies, including:

        (1)   Medical emergencies;
        (2)   Mental health emergencies; and
        (3)   Drug and alcohol withdrawal.

    c.   CCDOC shall ensure that all inmates with emergency health care needs receive prompt transport, including transport for outside care, for emergencies including:

        (1)   Medical emergencies; and
        (2)   Mental health emergencies.

    d.   Cermak shall ensure that all inmates with emergency health care needs receive timely and appropriate care, with prompt referrals for outside care when medically necessary, and shall notify CCDOC when emergency transport is needed inside or outside the Facility compound, for emergencies including:

        (1)   Medical emergencies; and
        (2)   Mental health emergencies.

    e.    CCDOC shall train all correctional officers to provide first responder assistance (including cardiopulmonary resuscitation ("CPR") and addressing serious bleeding) in emergency situations. CCDOC shall provide all correctional officers with the necessary protective gear, including masks and gloves, to provide first line emergency response.

47.    Record Keeping

    a.    Cermak shall ensure that medical and mental health records are adequate to assist in providing and managing the medical and mental health needs of inmates at the Facility and are maintained consistent with local, federal, and state medical records requirements.

    b.    Cermak shall ensure that medical and mental health records are centralized, complete, accurate, readily accessible, and systematically organized. All clinical encounters and reviews of inmates should be documented in the inmates' records.

    c.    To ensure continuity of care, Cermak shall submit appropriate medical information to outside medical providers when inmates are sent out of the Facility for medical care. Cermak shall appropriately request records of care, reports, and diagnostic tests received during outside appointments in a timely fashion and include such records in the inmate's medical record or document the inmate's refusal to cooperate and release medical records.

    d.    Cermak shall maintain unified medical and mental health records, including documentation of all clinical information regarding evaluation and treatment.

48.    Mortality Reviews

    a.    Cermak shall request an autopsy, and related medical data, for every inmate who dies while in the custody of CCDOC, including inmates who die following transfer to a hospital or emergency room.

    b.    Relevant CCDOC personnel shall participate in Cermak's mortality review for each inmate death while in custody, including inmates who die following transfer to a hospital or emergency room, and a morbidity review for all serious suicide attempts or other incidents in which an inmate was at high risk for death. Mortality and morbidity reviews shall seek to determine whether there was a systemic or specific problem that may have contributed to the incident. At a minimum, CCDOC's contribution to mortality and morbidity reviews shall

include:

    (1)    critical review and analysis of the correctional circumstances surrounding the incident;

    (2)    critical review of the correctional procedures relevant to the incident;

    (3)    synopsis of all relevant training received by involved correctional staff;

    (4)    possible precipitating correctional factors leading to the incident; and

    (5)    recommendations, if any, for changes in correctional policy, training, physical plant, and operational procedures.

c.    Cermak shall conduct a mortality review for each inmate death while in custody, including inmates who die following transfer to a hospital or emergency room, and a morbidity review for all serious suicide attempts or other incidents in which an inmate was at high risk for death. Cermak shall engage relevant CCDOC personnel in mortality and morbidity reviews and shall seek to determine whether there was a pattern of symptoms that might have resulted in earlier diagnosis and intervention. Mortality and morbidity reviews shall occur within 30 days of the incident or death, and shall be revisited when the final autopsy results are available. At a minimum, the mortality and morbidity reviews shall include:

    (1)    critical review and analysis of the circumstances surrounding the incident;

    (2)    critical review of the procedures relevant to the incident;

    (3)    synopsis of all relevant training received by involved staff;

    (4)    pertinent medical and mental health services/reports involving the victim;

    (5)    possible precipitating factors leading to the incident; and

    (6)    recommendations, if any, for changes in policy, training, physical plant, medical or mental health services, and operational procedures.

d.    Cermak shall address any problems identified during mortality and morbidity reviews through timely training, policy revision, and any other appropriate measures.

49.    Cermak shall develop and implement policies and procedures for appropriate handling of grievances relating to health care, when such grievances are forwarded from CCDOC.

## C.   MEDICAL CARE

50.    Health Assessments

a.    Cermak shall ensure that Qualified Medical Professionals attempt to elicit the

29

amount, frequency and time since the last dosage of medication from every inmate reporting that he or she is currently or recently on medication, including psychotropic medication.

b.    Cermak shall ensure that incoming inmates who present and are identified by medical personnel as having either a current risk of suicide or other acute mental health needs will be immediately referred for a mental health evaluation by a Qualified Mental Health Professional. Staff will constantly observe such inmates until they are seen by a Qualified Mental Health Professional or Qualified Mental Health Staff with appropriate, on-site supervision by a Qualified Mental Health Professional. Incoming inmates reporting these conditions will be housed in safe conditions unless and until a Mental Health Professional clears them for housing in a medical unit, segregation, or with the general population.

c.    Cermak shall ensure that all inmates at risk for, or demonstrating signs and symptoms of, drug and alcohol withdrawal are timely identified. Cermak shall provide appropriate treatment, housing, and medical supervision for inmates suffering from drug and alcohol withdrawal.

d.    CCDOC shall maintain a policy that correctional officers supervising newly arrived inmates physically observe the conduct and appearance of these inmates to determine whether they have a more immediate need for medical or mental health attention prior to or following the intake health screening by Qualified Medical Staff.

e.    Cermak shall ensure that the medical assessment performed within two working days of his or her booking at the Facility, or sooner if clinically indicated, for each inmate specified above (provision 45.f, "Intake Screening") shall include a review of the inmate's intake screening form, a medical history, a physical examination, a mental health history, and a current mental status examination. The physical examination shall be conducted by a Qualified Medical Professional. The medical assessment shall also include development or revision of the inmate's problem list and treatment plan to address issues identified during the medical assessment. Records documenting the assessment and results shall become part of each inmate's medical record. A re-admitted inmate or an inmate transferred from another facility who has received a documented medical assessment within the previous six months and whose receiving screening shows no change in the inmate's health status need not receive a new medical assessment. For such inmates, Qualified Medical Staff shall review prior records and update tests and examinations as needed.

30

51.   Acute care

   a.   Cermak shall provide adequate and timely acute care for inmates with serious and life-threatening conditions, and ensure that such care adequately addresses the serious medical needs of inmates. Adequate care will include timely medical appointments and follow-up medical treatment.

   b.   Cermak shall maintain guidelines for the scope of care of acutely ill patients in its on-site designated infirmary units and for transfer of patients when appropriate to outside hospitals.

52.   Chronic care

   a.   Cermak shall maintain an appropriate, written chronic care disease management plan, which provides inmates with chronic diseases with timely and appropriate diagnosis, treatment, medication, monitoring, and continuity of care consistent with the inmates' expected length of stay.

   b.   Cermak shall maintain appropriate written clinical practice guidelines for chronic diseases, such as HIV, hypertension, diabetes, asthma, and elevated blood lipids.

   c.   Cermak shall maintain an updated registry to track all inmates with serious and/or chronic illnesses and shall monitor this registry to ensure that these inmates receive necessary diagnoses and treatment. Cermak shall keep records of all care provided to inmates diagnosed with chronic illnesses in the inmates' individual medical records.

   d.   Cermak shall ensure that inmates with chronic conditions are routinely seen by a physician, physician assistant, or advanced practice nurse to evaluate the status of their health and the effectiveness of the medication administered for their chronic conditions.

   e.   CCDOC shall house inmates with disabilities, or who need skilled nursing services or assistance with activities of daily living, in appropriate facilities, as determined by Cermak. CCDOC shall permit inmates with disabilities to retain appropriate aids to impairment, as determined by Cermak.

   f.   Cermak shall ensure that inmates with disabilities or who need skilled nursing services or assistance with activities of daily living shall receive medically

31

appropriate care. Cermak shall notify CCDOC of their specific needs for housing and aids to impairment.

g. Cook County shall build out, remodel, or renovate clinical space as needed to provide appropriate facilities for inmates with disabilities in accordance with the timelines set out in provision 43.i. Prior to completion of the new clinical space, Cook County and DFM will work with Cermak to address the most serious concerns regarding facilities for inmates with disabilities, to the extent possible in the current Facility.

53. Treatment and Management of Communicable Disease

a. Cermak shall maintain adequate testing, monitoring, and treatment programs for management of communicable diseases, including tuberculosis ("TB"), skin infections, and sexually transmitted infections ("STIs").

b. CCDOC shall comply with infection control policies and procedures, as developed by Cermak, that address contact, blood borne, and airborne hazards, to prevent the spread of infections or communicable diseases, including TB, skin infections, and STIs, consistent with generally accepted correctional standards of care.

c. Cermak shall maintain infection control policies and procedures that address contact, blood borne, and airborne hazards, to prevent the spread of infections or communicable diseases, including TB, skin infections, and STIs, consistent with generally accepted correctional standards of care. Such policies should provide guidelines for identification, treatment, and containment to prevent transmission of infectious diseases to staff or inmates.

d. Pursuant to Centers for Disease Control ("CDC") Guidelines, Cermak shall continue to test all inmates for TB upon booking at the Facility and shall follow up on test results as medically indicated. Cermak shall follow current CDC guidelines for management of inmates with TB infection, including providing prophylactic medication when medically appropriate and consistent with the inmate's expected length of stay. Inmates who exhibit signs or symptoms consistent with TB shall be isolated from other inmates, evaluated for contagious TB, and housed in an appropriate, specialized respiratory isolation ("negative pressure") room. Cermak shall notify CCDOC of inmates' specific housing requirements and precautions for transportation for the purpose of infection control.

e.  Cermak shall ensure that the negative pressure and ventilation systems function properly.  Following CDC guidelines, Cermak shall test daily for rooms in-use and monthly for rooms not currently in-use.  Cermak shall document results of such testing.

f.  Cermak shall notify DFM, in a timely manner, of routine and emergency maintenance needs, including plumbing, lighting, and ventilation problems.

g.  Cermak shall develop and implement adequate guidelines to ensure that inmates receive appropriate wound care.  Such guidelines will include precautions to limit the possible spread of Methicillin-resistant Staphylococcus aureus ("MRSA") and other communicable diseases.

h.  Cermak shall adequately maintain statistical information regarding communicable disease screening programs and other relevant statistical data necessary to adequately identify, treat, and control infectious diseases.

54.  Access to Health Care

a.  CCDOC will work with Cermak to facilitate timely and adequate accessibility of appropriate health care for inmates, as provided by Cermak.

b.  Cermak shall ensure the timely and adequate availability of appropriate health care for inmates.

c.  Cermak shall ensure that the medical request ("sick call") process for inmates is adequate and provides inmates with adequate access to medical care.  The sick call process shall include:

   (1)  written medical and mental health care slips available in English, Spanish, and other languages, as needed;

   (2)  opportunity for illiterate inmates and inmates who have physical or cognitive disabilities to access medical and mental health care; and

   (3)  opportunity for all inmates, irrespective of primary language, to access medical and mental health care.

d.  Cermak shall ensure that the sick call process includes confidential collection,

33

logging, and tracking of sick call requests seven days a week. Cermak shall ensure timely responses to sick call requests by Qualified Medical Staff. The logging procedure shall include documentation of the date and summary of each request for care, the date the inmate was seen, the name of the person who saw him or her, the disposition of the medical or mental health visit (e.g., referral; whether inmate scheduled for acute care visit), and, if follow-up care is necessary, the date and time of the inmate's next appointment. Cermak shall document the reason for and disposition of the medical or mental health care request in the inmate's medical record.

e.  Cermak shall develop and implement an effective system for screening medical requests within 24 hours of submission. Cermak shall ensure that sick call requests are appropriately prioritized based upon the seriousness of the medical issue.

f.  Cermak shall ensure that evaluation and treatment of inmates in response to a sick call request occurs in a clinical setting.

g.  Cermak shall ensure that Qualified Medical Staff make daily rounds in the isolation areas to give inmates in isolation adequate opportunities to contact and discuss medical and mental health concerns with Qualified Medical Staff in a setting that affords as much privacy as reasonable security precautions will allow. During rounds, Qualified Medical Staff will assess inmates for new clinical findings, such as deterioration of the inmate's condition.

55.  Follow-Up Care

a.  Cermak shall provide adequate care and maintain appropriate records for inmates who return to the Facility following hospitalization or outside emergency room visits.

b.  Cermak shall ensure that inmates who receive specialty, emergency room, or hospital care are evaluated upon their return to the Facility and that, at a minimum, discharge instructions are obtained, appropriate Qualified Medical Staff reviews the information and documentation available from the visit, this review and the outside provider's documentation are recorded in the inmate's medical record, and appropriate follow-up is provided.

34

56.     Medication Administration

a.      Cermak shall ensure that treatment and administration of medication to inmates is implemented in accordance with generally accepted correctional standards of care.

b.      Cermak shall develop policies and procedures to ensure the accurate administration of medication and maintenance of medication records. Cermak shall provide a systematic physician review of the use of medication to ensure that each inmate's prescribed regimen continues to be appropriate and effective for his or her condition.

c.      Cermak shall ensure that medicine administration is hygienic, appropriate for the needs of inmates, and is recorded concurrently with distribution.

d.      Cermak shall ensure that medication administration is performed by Qualified Nursing Staff.

e.      When Cermak prescribes medication to address an inmate's serious mental health needs, HIV or AIDS, or thromboembolic disease, Cermak shall alert CCDOC that the inmate in question is on a flagged medication. If the prescription is terminated during an inmate's stay at the Facility, Cermak will notify CCDOC.

f.      When CCDOC receives notice that an inmate is on a flagged medication, CCDOC shall include notation of a medication flag in the inmate's profile on the Facility's Jail Management System.

g.      When an inmate with a medication flag is processed for discharge at the Facility, CCDOC shall escort the inmate to designated Cermak staff in the intake screening area of the Facility for discharge medication instructions.

h.      When CCDOC escorts an inmate with a medication flag to Cermak staff during discharge processing, Cermak staff shall provide the inmate with printed instructions regarding prescription medication and community resources.

i.      Each morning, CCDOC shall provide Cermak with a list of all inmates with medication flags who were discharged the previous day.

j.      Within 24 hours of discharge of an inmate with a medication flag, Cermak shall call in an appropriate prescription to the designated pharmacy on the Stroger

35

Hospital campus to serve as a bridge until inmates can arrange for continuity of care in the community.

k.      CCDOC shall ensure that information about pending transfers of inmates is communicated to Cermak as soon as it is available.

l.      When CCDOC has advance notice and alerts Cermak of the pending transfer to another correctional facility of inmates with serious medical or mental health needs from detention, Cermak shall supply sufficient medication for the period of transit. In such cases, Cermak shall prepare and send with transferring inmates a transfer summary detailing major health problems and listing current medications and dosages, as well as medication history while at the Facility.

m.      CCDOC shall ensure that the transfer summary and any other medical records provided by Cermak will accompany inmates, or will be made available electronically or transmitted by facsimile, when they are transferred from the Facility to another institution.

57.   Specialty Care

a.      Cermak shall ensure that inmates whose serious medical or mental health needs extend beyond the services available at the Facility shall receive timely and appropriate referral for specialty care to appropriate medical or mental health care professionals qualified to meet their needs.

b.      Upon reasonable notification by Cermak, CCDOC will transport inmates who have been referred for outside specialty care to their appointments.

c.      Cermak shall ensure that inmates who have been referred for outside specialty care by the medical staff or another specialty care provider are scheduled for timely outside care appointments. Cermak shall provide reasonable notice to CCDOC of such appointments so that CCDOC can arrange transportation. Inmates awaiting outside care shall be seen by Qualified Medical Staff as medically necessary, at clinically appropriate intervals, to evaluate the current urgency of the problem and respond as medically appropriate.  If an inmate refuses treatment following transport for a scheduled appointment, Cermak shall have the inmate document his refusal in writing and include such documentation in the inmate's medical record.

d.      Cermak shall maintain a current log of all inmates who have been referred for

36

outside specialty care, including the date of the referral, the date the appointment was scheduled, the date the appointment occurred, the reason for any missed or delayed appointments, and information on follow-up care, including the dates of any future appointments.

e.     Cermak shall ensure that pregnant inmates are provided adequate pre-natal care. Cermak shall develop and implement appropriate written policies and protocols for the treatment of pregnant inmates, including appropriate screening, treatment, and management of high risk pregnancies.

58.   Dental Care

a.     Cermak shall ensure that inmates receive adequate dental care, and follow up, in accordance with generally accepted correctional standards of care. Such care should be provided in a timely manner, taking into consideration the acuity of the problem and the inmate's anticipated length of stay. Dental care shall not be limited to extractions.

b.     Cermak shall ensure that adequate dentist staffing and hours shall be provided to avoid unreasonable delays in dental care.

**D.    MENTAL HEALTH CARE**

59.   Assessment and Treatment

a.     Results of mental health intake screenings (see provision 45.c, "Intake Screening") will be reviewed by Qualified Mental Health Staff for appropriate disposition.

b.     Cermak shall develop and implement policies and procedures to assess inmates with mental illness; and to evaluate inmates' mental health needs. Said policies shall include definitions of emergent, urgent, and routine mental health needs, as well as timeframes for the provision of services for each category of mental health needs.

c.     Cermak shall ensure that any inmate who screens positively for mental illness or suicidal ideation during the intake screening process, through a mental health assessment, or who is otherwise referred for mental health services, receives a clinically appropriate mental health evaluation in a timely manner, based on emergent, urgent, and routine mental health needs, from a Qualified Mental

Health Professional, or Qualified Mental Health Staff with appropriate, on-site supervision by a Qualified Mental Health Professional. Such mental health evaluation shall include a recorded diagnosis section on Axis I, II, and III, using the DSM-IV-TR, or subsequent Diagnostic and Statistical Manual of the American Psychiatric Association. If a Qualified Mental Health Professional, or a Qualified Mental Health Staff with appropriate, on-site supervision by a Qualified Mental Health Professional, finds a serious mental illness, they shall refer the inmate for appropriate treatment. Cermak shall request and review available information regarding any diagnosis made by the inmate's community or hospital treatment provider, and shall account for the inmate's psychiatric history as a part of the assessment. Cermak shall adequately document the mental health evaluation in the inmate's medical record.

d.      Cermak shall ensure clinically appropriate and timely treatment for inmates whose assessments reveal serious mental illness or serious mental health needs, including timely and regularly scheduled visits with Qualified Mental Health Professionals or with Qualified Mental Health Staff, with appropriate, on-site supervision by a Qualified Mental Health Professional.

e.      Cermak shall ensure that treatment plans adequately address inmates' serious mental health needs and that the plans contain interventions specifically tailored to the inmates' diagnoses.

f.      Cermak shall provide 24-hour/7-day psychiatric coverage to meet inmates' serious mental health needs and ensure that psychiatrists see inmates in a timely manner.

g.      Cermak shall ensure timely provision of therapy, counseling, and other mental health programs for all inmates with serious mental illness. This includes adequate number of Qualified Mental Health Staff to provide treatment, and an adequate array of structured therapeutic programming. Cermak will develop and implement policies and procedures defining the various levels of care and identifying the space, staffing, and programming that are appropriate to each identified level of care.

h.      Inmates shall have access to appropriate infirmary psychiatric care when clinically appropriate.

i.      Cermak shall provide the designated CCDOC official responsible for inmate disciplinary hearings with a mental health caseload roster listing the inmates

currently receiving mental health care.

j.    When CCDOC alerts Cermak that an inmate is placed in lock down status for disciplinary reasons, a Qualified Mental Health Professional will review the disciplinary charges against inmate to determine the extent to which the charge was related to serious mental illness. The Qualified Mental Health Professional will make recommendations to CCDOC when an inmate's serious mental illness should be considered as a mitigating factor when punishment is imposed on an inmate with a serious mental illness and to minimize any deleterious effect of disciplinary measures on an inmate's mental health status.

k.    In the case of mentally ill inmates in segregation, CCDOC shall consult with Cermak to determine whether continued segregation is appropriate or whether the inmate would be appropriate for graduated alternative based on Cermak's assessment.

l.    Cermak shall ensure that mentally ill inmates in segregation receive timely and appropriate treatment, including completion and documentation of regular rounds in the segregation units at least once per week by adequately trained Qualified Mental Health Professionals or by Qualified Mental Health Staff with appropriate, on-site supervision by a Qualified Mental Health Professional, in order to assess the serious mental health needs of inmates in segregation. Inmates who are placed in segregation shall be evaluated within 24 hours of placement and thereafter regularly evaluated by a Qualified Mental Health Professional, or by a Qualified Mental Health Staff with appropriate, on-site supervision by a Qualified Mental Health Professional to determine the inmate's mental health status, which shall include an assessment of the potential effect of segregation on the inmate's mental health. During these regular evaluations, Cermak shall provide CCDOC with its recommendation regarding whether continued segregation is appropriate or whether the inmate would be appropriate for graduated alternative based on the assessment of the Qualified Mental Health Professional, or Qualified Mental Health Staff with appropriate, on-site supervision by a Qualified Mental Health Professional.

m.    Cermak shall maintain an updated log of inmates receiving mental health services, which shall include both those inmates who receive counseling and those who receive medication. Cermak shall create such a log within six months of the date this Agreed Order is executed. The log shall include each inmate's name, diagnosis or complaint, and next scheduled appointment. Each clinician shall have ready access to a current log listing any prescribed medication and dosages

for inmates on psychotropic medications.  In addition, inmate's medical records shall contain current and accurate information regarding any medication changes ordered in at least the past year.

n.   Cermak shall ensure that a psychiatrist, physician or licensed clinical psychologist conducts an in-person evaluation of an inmate prior to a seclusion or restraint order, or as soon thereafter as possible.  An appropriately credentialed registered nurse may conduct the in-person evaluation of an inmate prior to a seclusion or restraint order that is limited to two hours in duration.  Patients placed in medically-ordered seclusion or restraints shall be evaluated on an on-going basis for physical and mental deterioration.  Seclusion or restraint orders should include sufficient criteria for release.

o.   Cermak shall ensure an adequate array of crisis services to appropriately manage the psychiatric emergencies that occur among inmates.  Crisis services shall not be limited to administrative segregation or observation status.

p.   Cermak shall ensure that inmates have access to appropriate acute infirmary care, comparable to in-patient psychiatric care, within the Cermak facility.

60.   Psychotherapeutic Medication Administration

a.   Cermak shall ensure that psychotropic medication orders are reviewed by a psychiatrist on a regular, timely basis for appropriateness or adjustment.  Cermak shall ensure that changes to an inmate's psychotropic medications are clinically justified and documented in the inmate's medical record.

b.   Cermak shall ensure timely implementation of physician orders for medication and laboratory tests.  Cermak shall ensure that inmates who are being treated with psychotropic medications are seen regularly by a physician to monitor responses and potential reactions to those medications, including movement disorders, and provide treatment where appropriate.

## E.   SUICIDE PREVENTION MEASURES

61.   Suicide Prevention Policy

a.   CCDOC shall participate with Cermak in a jointly established Suicide Prevention Committee charged with developing policies and procedures to ensure the appropriate management of suicidal inmates and with implementing and

monitoring a suicide prevention program in accordance with generally accepted correctional standards of care.

b.    Cermak shall participate with CCDOC in a jointly established Suicide Prevention Committee charged with developing policies and procedures to ensure the appropriate management of suicidal inmates and with implementing and monitoring a suicide prevention program in accordance with generally accepted correctional standards of care.

c.    The suicide prevention policy shall include, at a minimum, the following provisions:

    (1)    an operational description of the requirements for both pre-service and annual in-service training;
    (2)    intake screening/assessment;
    (3)    communication;
    (4)    housing;
    (5)    observation;
    (6)    intervention; and
    (7)    mortality and morbidity review.

62.    Suicide Precautions

a.    CCDOC shall ensure that, where suicide prevention procedures established jointly with Cermak involve correctional personnel for constant direct supervision of actively suicidal inmates or close supervision of special needs inmates with lower levels of risk (e.g., 15 minute checks), correctional personnel perform and document their monitoring and checks.

b.    Cermak shall ensure that, where suicide prevention procedures established jointly with CCDOC involve health care personnel for constant direct supervision of actively suicidal inmates or close supervision of special needs inmates with lower levels of risk (e.g., 15 minute checks), health care personnel perform and document their monitoring and checks.

c.    CCDOC shall ensure that when an inmate is identified as suicidal, the inmate shall be searched and monitored with constant direct supervision until the inmate is transferred to appropriate Cermak staff.

d.    Cermak shall develop and implement policies and procedures for suicide

41

precautions that will set forth the conditions of the watch, including but not limited to allowable clothing, property, and utensils, in accordance with generally accepted correctional standards of care. These conditions shall be altered only on the written instruction of a Qualified Mental Health Professional, except under emergency circumstances.

63. Cermak shall ensure that Qualified Mental Health Staff assess and interact with (not just observe) inmates on Suicide Precautions, and document the assessment and interaction on a daily basis.

64. Suicide Risk Assessments

    a.    Cermak shall ensure that any inmate showing signs and symptoms of suicide is assessed by a Qualified Mental Health Professional using an appropriate, formalized suicide risk assessment instrument within an appropriate time not to exceed 24 hours of the initiation of Suicide Precautions.

    b.    Cermak shall ensure that the risk assessment shall include the following:

        (1)    description of the antecedent events and precipitating factors;
        (2)    mental status examination;
        (3)    previous psychiatric and suicide risk history;
        (4)    level of lethality;
        (5)    current medication and diagnosis; and
        (6)    recommendations or treatment plan. Findings from the risk assessment shall be documented on both the assessment form and in the inmate's medical record.

65. Cermak shall ensure that inmates will only be removed from Suicide Precautions after a suicide risk assessment has been performed and approved by a Qualified Mental Health Professional, in consultation with a psychiatrist. A Qualified Mental Health Professional shall write appropriate discharge orders, including treatment recommendations and required mental health follow-up.

66. Suicide Prevention Policies

    a.    CCDOC shall ensure that suicide prevention policies established jointly with Cermak include procedures to ensure the safe housing and supervision of inmates based on the acuity of their mental health needs, in accordance with generally accepted correctional standards.

    b.    Cermak shall ensure that suicide prevention policies established jointly with CCDOC include procedures to ensure the safe housing and supervision of inmates based on the acuity of their mental health needs, in accordance with generally accepted correctional standards.

67.    DFM shall ensure that cells designated by CCDOC or Cermak for housing suicidal inmates shall be retrofitted to render them suicide-resistant (e.g., elimination of protrusive shower heads, unshielded lighting or electrical sockets). Inmates known to be suicidal shall not be housed in cells with exposed bars.

68.    Suicide Prevention Training

    a.    Cermak shall ensure that the Facility's suicide prevention curriculum for health care staff members, jointly established with CCDOC, addresses the following topics:

        (1)    the suicide prevention policy as revised consistent with this Agreed Order;

        (2)    why facility environments may contribute to suicidal behavior;

        (3)    potential predisposing factors to suicide;

        (4)    high risk suicide periods;

        (5)    warning signs and symptoms of suicidal behavior;

        (6)    observation techniques;

        (7)    searches of inmates who are placed on Suicide Precautions;

        (8)    case studies of recent suicides and serious suicide attempts (Serious suicide attempts are typically considered to be those that either were potentially life-threatening or that required medical attention);

        (9)    mock demonstrations regarding the proper response to a suicide attempt; and

        (10)    the proper use of emergency equipment, including suicide cut-down tools.

43

b.   Within 24 months of the effective date of this Agreed Order, CCDOC shall train all CCDOC staff members who work with inmates on the Facility's suicide prevention program. Implementation of such training shall begin as soon as possible following the effective date of this Agreed Order. Staff shall demonstrate competency in the verbal and behavioral cues that indicate potential suicide, and how to respond appropriately. Initial and at least annual training shall be provided in accordance with generally accepted professional standards.

c.   Within 12 months of the effective date of this Agreed Order, Cermak shall train all Cermak staff members who work with inmates on the Facility's suicide prevention program. Implementation of such training shall begin as soon as possible following the effective date of this Agreed Order. Staff shall demonstrate competency in the verbal and behavioral cues that indicate potential suicide, and how to respond appropriately. Initial and at least annual training shall be provided in accordance with generally accepted professional standards.

69.   CCDOC shall ensure that security staff posts will be equipped, as appropriate, with readily available, safely secured, suicide cut-down tools.

70.   Cermak shall document inmate suicide attempts at the Facility, as defined by the Suicide Prevention Committee's policies and procedure in accordance with generally accepted correctional standards, in the inmate's correctional record in CCDOC's new Jail Management System, in order to ensure that both correctional and health care staff will be aware at future intakes of past suicide attempts, if an inmate with a history of suicide attempts is admitted to the Facility again in the future. Cermak will begin to document this information within six months after execution of this Agreement.

## F.   FIRE AND LIFE SAFETY

71.   CCDOC and DFM shall work together to develop and implement a comprehensive fire safety program and ensure compliance is appropriately documented. The initial fire safety plan shall be approved by the fire prevention authority having jurisdiction. The fire safety plan shall be reviewed thereafter by the appropriate fire prevention authority at least every two years, or within six months of any revisions to the plan, whichever is sooner. Fire safety and emergency procedures shall be standardized across divisions, to the extent possible given differences in physical plant and security levels.

72.   CCDOC shall develop and implement an evacuation plan for inmates and staff and ensure that comprehensive fire drills are conducted every three months on each shift. CCDOC shall document these drills, including start and stop times and the number and

location of inmates who were moved as part of the drills.

73.   DFM shall ensure that the Facility has adequate fire and life safety equipment, including installation and maintenance of fire alarms and smoke detectors in all housing areas according to applicable fire codes. Maintenance and storage areas shall be equipped with sprinklers or fire resistant enclosures in accordance with City of Chicago Fire Code (13-76-010).

74.   DFM shall ensure that all fire and life safety equipment is properly maintained and routinely inspected. DFM shall develop and implement a program related to the testing, maintenance and inspection of the Life Safety Equipment.

75.   CCDOC shall continue to ensure that emergency keys are appropriately marked and identifiable by touch and consistently stored in a quickly accessible location, and that staff are adequately trained in use of the emergency keys.

76.   CCDOC shall ensure that staff are able to manually unlock all doors (without use of the manual override in the event of an emergency in which the manual override is broken), including in the event of a power outage or smoke buildup where visual examination of keys is generally impossible. CCDOC shall conduct and document random audits to test staff proficiency in performing this task on all shifts, a minimum of three times per year. CCDOC shall conduct regular security inspections of all locking mechanisms. CCDOC shall communicate with DFM via the Work Order System regarding lock-related issues and maintenance.

77.   DFM shall develop and implement an annual preventative maintenance program concerning security devices such as door locks, fire and smoke barrier doors, and manual unlocking mechanisms to ensure these devices function properly in the event of an emergency.

78.   CCDOC shall implement competency-based testing for staff regarding fire and emergency procedures.

79.   CCDOC shall promptly notify DFM of all electrical hazards, including maintenance and repair of electrical outlets, devices, and exposed electrical wires.

80.   DFM shall promptly repair all known electrical hazards, including maintenance and repair of electrical outlets, devices, and exposed electrical wires and will document repairs by the Work Order System.

81.   CCDOC shall ensure that combustibles are controlled and eliminate highly flammable materials throughout the facility and inmate living areas (e.g., inmates' use of paper bags as trash receptacles, ripped fire-retardant mattress covers, improvised cell light covers, blankets on cell floors, and improperly stored and labeled flammable liquids and other chemicals).

82.   CCDOC shall ensure that fire safety officers are trained in fire safety and have knowledge in basic housekeeping, emergency preparedness, basic applicable codes, and use of fire extinguishers and other emergency equipment.

## G.   SANITATION AND ENVIRONMENTAL CONDITIONS

83.   Sanitation and Maintenance of Facilities

   a.   DFM shall maintain an adequate written staffing plan and sufficient staffing levels to provide for adequate maintenance of the Facility.

   b.   CCDOC shall revise and implement written housekeeping and sanitation plans to ensure the proper routine cleaning of housing, shower, and medical areas, in accordance with generally accepted correctional standards. Such policies should include oversight and supervision, including meaningful inspection processes and documentation, as well as establish routine cleaning requirements for toilets, showers, and housing units.

   c.   DFM shall implement a preventive maintenance plan to respond to routine and emergency maintenance needs, including ensuring that shower, toilet, and sink units are adequately maintained and installed.

   d.   CCDOC shall notify DFM, in a timely manner, of routine and emergency maintenance needs, including plumbing, lighting, and ventilation problems.

   e.   DFM shall ensure adequate ventilation throughout the Facility to ensure that inmates receive an adequate supply of air flow and reasonable levels of heating and cooling. DFM staff shall review and assess compliance with this requirement on a daily basis for automated systems and on an annual basis for non-automated systems.

   f.   CCDOC shall notify DFM of any visible obstructions to the ventilation system.

   g.   Cook County shall ensure adequate lighting in all inmate housing and work areas.

46

h.   CCDOC shall ensure adequate pest control throughout the housing units, medical units, RCDC, RTU, and food storage areas. CCDOC shall maintain a contract for professional exterminator services for each division, food services areas, and the Cermak hospital. Services should provide for routine pest control spraying and additional spraying as needed.

i.   CCDOC shall ensure that all inmates have access to needed hygiene supplies.

j.   CCDOC shall develop and implement policies and procedures for cleaning, handling, storing, and disposing of biohazardous materials, in accordance with generally accepted correctional standards. CCDOC shall ensure that any inmate or staff utilized to clean a biohazardous area are properly trained in universal precautions, are outfitted with protective materials, and receive proper supervision when cleaning a biohazardous area.

k.   DFM shall develop a policy on hazardous materials storage, in accordance with generally accepted correctional standards, and insure that all DFM staff is properly trained on the procedure.

l.   CCDOC shall provide and ensure the use of cleaning chemicals that sufficiently destroy the pathogens and organisms in biohazard spills.

m.   CCDOC shall inspect and replace as often as needed all frayed and cracked mattresses. CCDOC shall destroy any mattress that cannot be sanitized sufficiently to kill any possible bacteria. CCDOC shall ensure that mattresses are properly sanitized between uses.

n.   CCDOC shall ensure adequate control and observation of all housing units, including distribution and collection of razors and cleaning supplies. All cleaning tools and hazardous chemicals shall be removed from housing areas after use.

o.   CCDOC shall ensure that Facility sanitarians receive training from a relevant state, national, or professional association with emphasis on assessment of environmental health practices and emerging environmental issues in correctional settings. Facility sanitarians should also have training on and access to testing equipment to ensure sanitary conditions.

84.    Sanitary Laundry Procedures

    a.    CCDOC shall develop and implement policies and procedures for laundry procedures to protect inmates from risk of exposure to communicable disease, in accordance with generally accepted correctional standards.  To limit the spread of communicable disease, CCDOC shall ensure that clothing and linens returned from off-site laundry facility are clean, sanitized, and dry.

    b.    CCDOC shall ensure that inmates are provided adequate clean clothing, underclothing and bedding, consistent with generally accepted correctional standards, and that the laundry exchange schedule provides consistent distribution and pickup service to all housing areas.

    c.    CCDOC shall train staff and educate inmates regarding laundry sanitation policies.

    d.    CCDOC shall ensure that laundry delivery procedures protect inmates from exposure to communicable diseases by preventing clean laundry from coming into contact with dirty laundry or contaminated surfaces.

    e.    CCDOC shall require inmates to provide all clothing and linens for laundering and prohibit inmates from washing and drying laundry outside the formal procedures.

85.    Food Service

    a.    CCDOC shall ensure that food service at the Facility is operated in a safe and hygienic manner and that foods are served and maintained at safe temperatures.

    b.    CCDOC shall ensure that all food service staff, including inmate staff, must be trained in food service operations, safe food handling procedures, and appropriate sanitation.

    c.    CCDOC shall ensure that the Central Kitchen and Division XI kitchen are staffed with a sufficient number of appropriately supervised and trained personnel.

    d.    CCDOC shall ensure that dishes and utensils, food preparation and storage areas, and vehicles and containers used to transport food are appropriately cleaned and sanitized.

e.     CCDOC shall check and record, on a regular basis, the temperatures in the refrigerators, coolers, walk-in-refrigerators, the dishwasher water, and all other kitchen equipment with temperature monitors to ensure proper maintenance of food service equipment.

## H.     QUALITY MANAGEMENT AND PERFORMANCE MEASUREMENT

86.     Quality Management and Performance Measurement

a.     Defendants shall each develop and implement written quality management policies and procedures, in accordance with generally accepted correctional standards, to regularly assess, identify, and take all reasonable measures to assure compliance with each of the provisions of this Agreed Order applicable to that Defendant.

b.     Defendants shall each develop and implement policies to address and correct deficiencies that are uncovered during the course of quality management activities, including monitoring corrective actions over time to ensure sustained resolution, for each of the provisions of this Agreed Order applicable to that Defendant.

c.     CCDOC shall participate with Cermak and DFM in a jointly established Health Care Quality Improvement Committee, to be charged with developing and implementing a joint quality improvement program. CCDOC shall contribute the time and effort of CCDOC staff members who, by virtue of their authority, current responsibilities, and/or past experience, can provide this committee with needed correctional representation.

d.     Cermak shall participate with CCDOC and DFM in a jointly established Health Care Quality Improvement Committee, to be charged with developing and implementing a joint quality improvement program. Cermak will work with CCDOC and DFM to identify those CCDOC and DFM staff members who, by virtue of their authority, current responsibilities, and/or past experience, can provide this committee with needed correctional representation. Quality management programs related to medical and mental health care will utilize performance measurements to assess quality of care and timely access to care with quantitative and qualitative data analysis and trending over time.

e.     DFM shall participate with CCDOC and Cermak in a jointly established Health Care Quality Improvement Committee, to be charged with developing and

49



implementing a joint quality improvement program. DFM shall contribute the time and effort of DFM staff members who, by virtue of their authority, current responsibilities, and/or past experience, can provide this committee with needed correctional representation.

## IV. MONITORING

A.    <u>Monitor Selection</u>: The parties have jointly selected Ms. Susan McCampbell to serve as the monitor for the CCDOC corrections provisions of the Agreed Order ("Corrections Monitor"). The parties have jointly selected Dr. Ronald Shansky to serve as the monitor for the medical provisions of this Agreed Order ("Medical Monitor"). The parties have jointly selected Dr. Jeffrey Metzner to serve as the monitor for the mental health provisions of this Agreed Order ("Mental Health Monitor"). The parties have jointly selected Mr. Harry Grenawitzke to serve as monitor for the physical plant (§§ III.F and III.G), DFM, and Capital Planning provisions of this Agreed Order ("Physical Plant Monitor"). With provisions that involve overlap between two disciplines, such as § III.B, Elements Common to Medical and Mental Health, the relevant Monitors shall coordinate in order to determine the proper manner for the necessary compliance assessment. Should any of the monitor positions become vacant and the parties cannot agree on a replacement, the parties shall recommend candidates to the Court, and the Court will appoint the Monitor. Neither party, nor any employee or agent of either party, shall have any supervisory authority over the Monitors' activities, reports, findings, or recommendations. The cost for the Monitors' fees and expenses shall be borne by Defendants. The selection of the Monitors shall be conducted solely pursuant to the procedures set forth in this Agreed Order, and will not be governed by any formal or legal procurement requirements. The Monitors may be terminated only for good cause, unrelated to the Monitors' findings or recommendations, and only with prior notice to, and approval of, the parties or by Court order. Should all the parties agree that a Monitor is not fulfilling his or her duties in accordance with this Agreed Order, the parties may petition the Court for the Monitor's immediate removal and replacement. One party may unilaterally petition the Court for the Monitor's removal for good cause, and the other parties will have the opportunity to respond to the petition.

B.    <u>Monitor Qualifications</u>: The Monitors shall have appropriate experience and education or training related to the subject areas covered in this Agreed Order.

C.    <u>Monitoring Team</u>: The Monitors may hire or consult with such additional qualified staff as necessary to fulfill the duties required by the Agreed Order ("Monitoring Teams"). The Monitors are ultimately responsible for the findings regarding compliance. The Monitoring Teams will be subject to all the same access rights and confidentiality

limitations, listed below, as the Monitors. The parties reserve the right to object for good cause to members of the Monitoring Teams.

D.   Monitor Access: The Monitors shall have full and complete access to the Facility, all Facility records, inmate medical records, staff, and inmates. Defendants shall direct all employees to cooperate fully with the Monitors. All non-public information obtained by the Monitors shall be maintained in a confidential manner.

E.   Monitor Ex Parte Communications: The Monitors shall be permitted to initiate and receive ex parte communications with all parties.

F.   Limitations on Public Disclosures by Monitors: Except as required or authorized by the terms of this Agreed Order or the parties acting together, the Monitors shall not: make any public statements (at a conference or otherwise) or issue findings with regard to any act or omission of Defendants or their agents, representatives or employees, or disclose nonpublic information provided to the Monitors pursuant to this Agreed Order. Any press statement made by the Monitors regarding his or her employment must first be approved in writing by all parties. The Monitors shall not testify in any other litigation or proceeding with regard to any act or omission of Defendants or any of their agents, representatives, or employees related to this Agreed Order, nor testify regarding any matter or subject that he or she may have learned as a result of his or her performance under this Agreed Order. Reports issued by the Monitors shall not be admissible against Defendants in any proceeding other than a proceeding related to the enforcement of this Agreed Order by Defendants or DOJ. Unless such conflict is waived by the parties, the Monitors shall not accept employment or provide consulting services that would present a conflict of interest with the Monitors' responsibilities under this Agreed Order, including being retained (on a paid or unpaid basis) by any current or future litigant or claimant, or such litigant's or claimant's attorney, in connection with a claim or suit against Defendants, their departments, officers, agents or employees. The Monitors are not a State/County or local agency or an agent thereof, and accordingly the records maintained by the Monitors shall not be deemed public records subject to public inspection. Neither the Monitors nor any person or entity hired or otherwise retained by the Monitors to assist in furthering any provision of this Agreed Order shall be liable for any claim, lawsuit or demand arising out of the Monitors' performance pursuant to this Agreed Order. This provision does not apply to any proceeding before a court related to performance of contracts or subcontracts for monitoring this Agreed Order.

G.   Monitors' Reports: The Monitors shall file with the Court and provide the parties with reports describing the steps taken by Defendants to implement this Agreed Order and evaluate the extent to which Defendants have complied with each substantive provision

of the Agreed Order. The Monitors shall issue an initial report four months after the effective date of this Agreed Order, and then every six months thereafter, unless both parties otherwise agree in writing. The reports shall be provided to the parties in draft form for comment at least two weeks prior to their issuance. These reports shall be written with due regard for the privacy interests of individual inmates and staff and the interest of Defendants in protecting against disclosure of non-public information.

H.  Compliance Assessments: In each Monitors' report, the Monitors shall evaluate the status of compliance for each relevant provision of the Agreed Order using the following standards: (1) Substantial Compliance; (2) Partial Compliance, and (3) Non-compliance. In order to assess compliance, the Monitors shall review a sufficient number of pertinent documents to accurately assess current conditions; interview all pertinent staff; and interview a sufficient number of inmates to accurately assess current conditions. The Monitors shall be responsible for independently verifying representations from Defendants regarding progress toward compliance, examining supporting documentation where applicable. Each Monitor's report shall describe the steps taken to analyze conditions and assess compliance, including documents reviewed and individuals interviewed, and the factual basis for each of the Monitor's findings.

I.  Budget: The parties acknowledge that compliance with certain provisions of this Agreed Order will require additional expenditure of funds. The parties also acknowledge that the budget for CCDOC, Cermak, and DFM is subject to approval by the Cook County Board of Commissioners.

J.  Monitors' Budget: Defendants shall provide the Monitors with a budget sufficient to allow the Monitors to carry out the responsibilities described in this Agreed Order. The Monitors shall pay the members of the Monitoring Teams out of this budget. Prior to selection for the Monitors' positions, each Monitor candidate proposed a reasonable, estimated budget sufficient to cover the responsibilities described in this Agreed Order.

K.  Technical Assistance by the Monitors: The Monitors shall provide Defendants with technical assistance as requested by Defendants.

### V. REPORTING REQUIREMENTS AND RIGHT OF ACCESS

A.  Defendants shall each submit semiannual compliance reports to DOJ and the Monitors, the first of which shall be filed within six months of the date of this Agreed Order. Thereafter, the semiannual reports shall be filed 15 days after the termination of each six-month period thereafter until the Agreed Order is terminated.

B.     Each compliance report shall describe the actions Defendants have taken during the reporting period to implement this Agreed Order and shall make specific reference to the Agreed Order provisions being implemented.

C.     Defendants shall maintain sufficient records to document that the requirements of this Agreed Order are being properly implemented and shall make such records available to DOJ at reasonable times for inspection and copying.  In addition, Defendants shall maintain and submit upon request records or other documents to verify that they have taken such actions as described in their compliance reports (e.g., census summaries, policies, procedures, protocols, training materials, and incident reports) and will also provide all documents reasonably requested by DOJ.

D.     DOJ and its attorneys, consultants, and agents shall have unrestricted access to the Facility, inmates, staff (including CCDOC, DFM, and Cermak staff, or staff from any other outside medical or mental health services provider), and documents as reasonably necessary to address issues affected by this Agreed Order.

E.     Within 30 days of receipt of written questions from DOJ concerning Defendants' compliance with the requirements of this Agreed Order, Defendants shall provide DOJ with written answers and any requested documents.

F.     CCDOC and Cook County shall each appoint a compliance coordinator to oversee compliance with this Agreed Order and to serve as a point of contact.

G.     Whenever any Defendant invokes exigent circumstances to take action that departs from what would otherwise be the requirements of this Agreed Order, that Defendant shall, immediately upon taking such action, notify the Monitors and DOJ of the exigent circumstances relied upon, the corresponding action taken, what it believes will be the duration of such circumstances and such action, and the steps it is taking to attempt to limit the duration of such action to as short a term as practicable.

## VI. ENFORCEMENT

A.     During the period that the Agreed Order is in force, if any of the Monitors or DOJ determines that a Defendant has not made material progress toward substantial compliance with a significant obligation under the Agreed Order, and such failure constitutes a violation of inmates' constitutional rights, DOJ may, but is not required to, seek enforcement of the Agreed Order in Court.

B.     Prior to taking judicial action to enforce the Agreed Order, DOJ shall give Defendants

53

written notice of its intent to seek enforcement of the Agreed Order, and the parties shall engage in good-faith discussions to resolve the dispute.

C.    The relevant Defendant(s) shall have 30 days from the date of such notice to cure the failure (or such additional time as is reasonable due to the nature of the issue and agreed upon by the parties) and provide DOJ with sufficient proof of its cure. At the end of the 30-day period (or such additional time as is reasonable due to the nature of the issue and agreed upon by the parties), in the event that DOJ determines that the failure has not been cured, DOJ may seek judicial action without further notice. DOJ commits to work in good faith with Defendants to avoid enforcement actions.

D.    The terms of this Agreed Order are not subject to state or federal court enforcement by anyone other than DOJ.

E.    In case of an emergency posing an immediate threat to the health or safety of an inmate or staff member at the Facility, however, DOJ may omit the notice and cure requirements herein before seeking enforcement of the Agreed Order.

## VII.   CONSTRUCTION, IMPLEMENTATION AND TERMINATION

A.    Defendants shall implement all reforms within their areas of responsibility, as designated within the provisions of this Agreed Order, that are necessary to effectuate this Agreed Order. The implementation of this Agreed Order will begin immediately upon the effective date.

B.    Except where otherwise agreed to under a specific provision of this Agreed Order, Defendants shall implement all provisions of this Agreed Order within 180 days of the entry of this Agreed Order.

C.    This Agreed Order shall terminate when Defendants have achieved substantial compliance with each of the provisions of the Agreed Order and have maintained Substantial Compliance with the Agreed Order for a period of 18 months. The parties anticipate that Defendants will have achieved substantial compliance with all provisions of the Agreed Order within four years of the Agreed Order's Effective Date and sustained compliance with each such provision for at least 18 months. The parties agree that a full substantive section of the Agreed Order (§ III.A: Protection from Harm, § III.B: Health Care Services, § III.C: Medical Care, § III.D: Mental Health Care, § III.E Suicide Prevention Measures, § III.F: Fire and Life Safety, § III.G: Sanitation and Environmental Conditions, or § III.H: Quality Management and Performance Measurement) may conclude independently of the rest of the Agreed Order in the event

54

that substantial compliance for all subcomponents of each provision in the full substantive section is achieved and maintained for the requisite 18-month period. In addition, if the responsible Defendant has substantially complied with all of the provisions assigned to it in a full substantive section of the Agreed Order (for example, CCDOC could substantially comply with all of the provisions specifically assigned to it in § III.C: Medical Care), and has maintained Substantial Compliance with all of those provisions for at least 18 months, those provisions may conclude independently of the rest of the Agreed Order. The burden shall be on the Defendant(s) to demonstrate this level of compliance. Non-compliance with mere technicalities, or temporary failure to comply during a period of otherwise sustained compliance will not constitute failure to maintain Substantial Compliance. At the same time, temporary compliance during a period of sustained Non-compliance shall not constitute Substantial Compliance.

D.   The parties agree that every two years following the effective date of this Agreed Order, the Court shall conduct a status conference regarding the status of Defendants' compliance with this Agreed Order.

E.   Failure by any party to enforce this entire Agreed Order or any provision thereof with respect to any deadline or any other provision herein shall not be construed as a waiver of its right to enforce other deadlines or provisions of this Agreed Order.

F.   If any unforeseen circumstance occurs that causes a failure to timely carry-out any requirements of this Agreed Order, Defendants shall notify DOJ in writing within 20 calendar days after Defendants become aware of the unforseen circumstance and its impact on the Defendant's ability to perform under the Agreed Order. The notice shall describe the cause of the failure to perform and the measures taken to prevent or minimize the failure. Defendants shall implement all reasonable measures to avoid or minimize any such failure.

G.   This Agreed Order shall constitute the entire integrated Agreed Order of the parties. With the exception of DOJ's findings letter, referenced in provision I.4 herein, and any DOJ technical assistance recommendations, no prior or contemporaneous communications, oral or written, will be relevant or admissible for purposes of determining the meaning of any provisions herein in this litigation or in any other proceeding.

H.   Nothing herein shall be deemed, construed, or interpreted as an admission of liability by Defendants. Neither this Agreed Order, nor any part thereof, shall be admissible against Defendants except in a proceeding involving the parties to this Agreed Order. Furthermore, by entering into this Agreed Order, Defendants do not waive the right to

contest the July 11, 2008 findings letter or any of the conclusions set forth therein.

I.    The Agreed Order shall be applicable to, and binding upon, all parties, their officers, agents, employees, assigns, and their successors in office.

J.    Each party shall bear the cost of its fees and expenses incurred in connection with this cause.

K.    In the event that any provision of this Agreed Order is declared invalid for any reason by a court of competent jurisdiction, said finding shall not affect the remaining provisions of this Agreed Order.

## VIII. STIPULATION PURSUANT TO THE PRISON LITIGATION REFORM ACT, 18 U.S.C. § 3626

A.    For the purposes of this Agreed Order only and in order to settle this matter, the parties stipulate that this Agreed Order complies in all respects with the provisions of 18 U.S.C. § 3626(a). The parties further stipulate and agree that the prospective relief in this Agreed Order is narrowly drawn, extends no further than necessary to correct the violations of federal rights alleged by the United States, is the least intrusive means necessary to correct these violations, and will not have an adverse impact on public safety or the operation of a criminal justice system. Accordingly, the parties agree and represent that the Agreed Order complies in all respects with the provisions of 18 U.S.C. § 3626(a).

B.    The issue of liability has not been litigated.

C.    This Agreed Order is not intended to have any preclusive effect except between the parties. Should the issue of the preclusive effect of this Agreed Order be raised, the parties agree to certify that this Agreed Order was intended to have no such preclusive effect.

**FOR THE UNITED STATES:**

PATRICK J. FITZGERALD
United States Attorney
Northern District of Illinois

PATRICK JOHNSON
JOAN LASER
Assistant United States Attorneys
Northern District of Illinois
219 South Dearborn Street
Chicago, Illinois  60604
(312) 353-5327
patrick.johnson2@usdoj.gov

THOMAS E. PEREZ
Assistant Attorney General
Civil Rights Division

ROY L. AUSTIN, JR.
Deputy Assistant Attorney General
Civil Rights Division

JUDY C. PRESTON
Acting Chief
Special Litigation Section

KERRY KRENTLER DEAN
DAVID DEUTSCH
COREY SANDERS
Trial Attorneys
U.S. Department of Justice
Civil Rights Division
Special Litigation Section
950 Pennsylvania Ave., NW
Washington, D.C.  20530
(202) 514-1841
kerry.k.dean@usdoj.gov

57

**FOR THE DEFENDANTS COOK COUNTY, IL
AND THE COOK COUNTY BOARD OF
COMMISSIONERS:**


TODD H. STROGER
President
Cook County Board of Commissioners


PATRICK T. DRISCOLL, JR.
Chief, Civil Actions Bureau
Office of the Cook County State's Attorney
66 W. Washington
Chicago, IL  60602
(312) 603-3378
pdrisco@cookcountygov.com
Attorney for Cook County

**FOR THE DEFENDANT SHERIFF:**

THOMAS DART
Cook County Sheriff

DANIEL F. GALLAGHER
Querrey & Harrow
175 W. Jackson Boulevard, Ste. 1600
Chicago, IL 60604-2827
(312) 540-7674
dgallagher@querrey.com
Attorney for Cook County Sheriff

SO ORDERED this 26th day of May, 2010:

UNITED STATES DISTRICT COURT JUDGE
NORTHERN DISTRICT OF ILLINOIS